William TARASI, George Sampas and Virginia R. Harrigan, Appellants,

v.

PITTSBURGH NATIONAL BANK and S. Robert Mialki.

No. 76–1834.

United States Court of Appeals, Third Circuit.

Argued Feb. 24, 1977.

Decided May 9, 1977.

As Amended June 15, 1977.

---

Louis M. Tarasi, Jr., Philip A. Faix, Jr., John Alan Conte, Conte, Courtney & Tarasi, Pittsburgh, Pa., for appellants.

B. A. Karlowitz, Orlando R. Sodini, Donald L. Very, Tucker Arensberg & Ferguson, Pittsburgh, Pa., for appellee, Pittsburgh National Bank.

Carl W. Brueck, Brueck & Houck, Pittsburgh, Pa., for appellee, S. Robert Mialki.

OPINION OF THE COURT

Before ADAMS, KALODNER * and HUNTER, Circuit Judges.

ADAMS, Circuit Judge.

At issue in this appeal is whether the defense of *in pari delicto* stands as a bar to a lawsuit brought by "tippees" against a "tipper"[1] pursuant to section 10(b) of the Securities Exchange Act of 1934[2] and rule 10b–5[3] promulgated thereunder.

I.

Before reviewing the facts of this case, it is necessary to take note of the procedural posture of the litigation. Since this is an appeal from the grant of summary judgment for the defendants, we are obliged, of course, to consider the record in the light most favorable to plaintiffs. We then must determine whether the district judge erred in concluding that no issue of material fact remained and that defendants were entitled to a verdict as a matter of law.[4]

This suit was instituted in 1974 by William Tarasi, Virginia Harrigan and George Sampas against the Pittsburgh National Bank and S. Robert Mialki, an officer of the Bank and manager of its branch in Verona, Pennsylvania. The plaintiffs alleged that they purchased the stock of Meridian Industries, Inc. on the strength of information given to them by Mr. Mialki; that such information was false and misleading; and that the false and misleading information caused them to incur losses of $22,000.

Mr. Tarasi, a resident of the Pittsburgh area who operates a used car lot and a small contracting business, was the first of the plaintiffs who had contact with Mr. Mialki. Although he has dabbled in real estate speculation in both Pennsylvania and Florida, the record indicates that he has not had extensive experience with securities investments. In the course of his past business dealings, Mr. Tarasi had employed PNB as his bank and Mr. Mialki as his personal banker. As a result of the latter relationship, Mr. Tarasi and Mr. Mialki became friends, and had known each other for about five years before the incidents that led to this lawsuit.

Beginning in November of 1971, Mr. Tarasi alleged, Mr. Mialki had numerous discussions with him about two corporations: Meridian Industries and Paragon Plastics. According to Mr. Tarasi, Mr. Mialki stated that a merger between Meridian and Paragon was going to take place, that the Bank was behind the merger, and that "big shots" from the Bank were investing heavily in the securities of the two companies. Mr. Mialki indicated to Mr. Tarasi that it was too late to get on the Paragon "bandwagon," but that an investment in Meridian would still be a wise one. In particular, Mr. Mialki purportedly told Mr. Tarasi that Meridian common stock, which was then selling at eight dollars a share, would probably double in value because of the planned merger. Mr. Tarasi testified in his deposition that Mr. Mialki had represented that the data he was giving him was "hush-hush" and could not be repeated to anyone. In response to these disclosures, Mr. Tarasi purchased 1200 shares of Meridian common stock on the open market at 8¼ per share. Mr. Tarasi did not reveal, in connection with his purchase of Meridian stock, the information he had received about the planned merger between Meridian and Paragon.

---

* Judge Kalodner participated in the argument and conference in this appeal, but died before the filing of this opinion.

1. A "tipper" is a person who has possession of material inside information and who makes selective disclosure of such information for trading or other personal purposes. A "tippee" is one who receives such information from a "tipper." See 2 A. Bromberg, *Securities Law: Fraud, S.E.C. Rule 10b–5* at 190.7 (1973); 3 L. Loss, *Securities Regulation* 1450–51 (1961).

2. 15 U.S.C. § 78j(b) (1970).

3. 17 C.F.R. § 240.10b–5 (1975).

4. *See, e. g., Scott v. Plante,* 532 F.2d 939 (3d Cir. 1976); *Ransburg Electro-Coating Corp. v. Lansdale Finishers, Inc.,* 484 F.2d 1037 (3d Cir. 1973); *Janek v. Celebrezze,* 336 F.2d 828 (3d Cir. 1964).

The second plaintiff, Mrs. Harrigan, is an aunt of Mr. Tarasi.[5] According to the record, Mr. Tarasi asked Mr. Mialki for permission to inform Mrs. Harrigan that Meridian was a good investment opportunity. At a luncheon attended by Mrs. Harrigan, Mr. Tarasi and Mr. Mialki, the two gentlemen had a discussion about Meridian. When Mrs. Harrigan expressed interest, Mr. Tarasi recommended that she purchase shares in Meridian. Mr. Mialki made a general statement to the effect that Meridian was "good stock."

After the luncheon, Mrs. Harrigan proceeded to direct inquiries about Meridian to her regular banker and to a broker. Although the broker apparently recommended against purchasing the stock, Mrs. Harrigan said to him that she thought it would be a sound buy. Before acquiring the securities, however, she decided to speak to Mr. Mialki again. Another luncheon took place, at which time Mrs. Harrigan asked Mr. Tarasi whether Meridian was a sound investment. Mr. Tarasi said that Meridian was good stock and then gestured towards Mr. Mialki who added that the Bank was behind it. The record indicates nonetheless, that the proposed merger between Paragon and Meridian was not mentioned to Mrs. Harrigan. Mrs. Harrigan purchased 100 shares of Meridian common stock on the open market at 8⅞ per share, but did not disclose her discussions with Mr. Mialki and Mr. Tarasi in connection with her dealings in the stock.

Mr. Sampas, the third plaintiff, is a member of the Florida bar engaged in the general practice of law. He declared in his deposition that his practice does not involve securities law matters. Mr. Sampas is also a long-time friend of Mr. Tarasi. In December of 1971, Mr. Sampas attended a luncheon with Mr. Tarasi and Mr. Mialki, during which the Paragon-Meridian merger was mentioned. Sensing that a lucrative investment possibility existed, Mr. Sampas joined in the conversation. He avers that he also wanted to get additional information from Mr. Mialki because he believed that Mr. Tarasi knew very little about securities investments.

The ensuing discussion essentially covered the information that Mr. Mialki had previously supplied to Mr. Tarasi. Mr. Mialki stated that a merger between Paragon and Meridian was imminent, and that executives of the Bank were making heavy investments in both corporations. He also said that, although it was too late to purchase Paragon so as to reap the benefits of the merger, investment in Meridian was still a wise idea since its common stock would probably double in value.

Upon receiving such information, Mr. Sampas purchased a number of three-month "call" options for Meridian stock. During this period of time, Mr. Sampas kept in continuous communication with Mr. Mialki in order to learn when the merger would be consummated and when would be the best time to exercise his options. At every juncture, Mr. Mialki reassured him regarding the prospects for the merger and for the appreciation in value of his investment.

As the time for the exercise of the options began running out, Mr. Sampas grew quite concerned because the merger had not taken place and he stood to lose his investment. He contacted Mr. Mialki, who advised him that the Securities and Exchange Commission had delayed the merger but that it would surely go through. When Mr. Sampas asked whether Meridian's stock would increase in value, Mr. Mialki represented that it would.

Mr. Sampas then approached Shirley Wolff—a member of the law firm with which he was associated and an experienced investor in securities—and explained his predicament with regard to the "calls." Ms. Wolff agreed to purchase 1000 shares of Meridian, and Mr. Sampas promised to split any of his profits with her and to bear any of her losses.

---

5. Subsequent to the events involved in this litigation, Mrs. Harrigan remarried. She is now known as Virginia Rooney.

In his deposition, Mr. Sampas averred that he realized that the information about the Paragon-Meridian merger which he had received from Mr. Mialki was in the nature of a "tip," and that Mr. Mialki had learned of the proposed merger through his position at that bank.

Mr. Sampas did not disclose his knowledge of the proposed merger when he purchased the "call" options nor did he divulge to Ms. Wolff what he knew of the proposed merger or the Bank's interest in it while arranging for her purchase of the Meridian stock. And this information was not revealed in connection with Ms. Wolff's purchase on the open market.

The merger between Paragon and Meridian did not occur,[6] and the value of the Meridian stock declined to about one dollar per share. Mr. Tarasi reimbursed Mrs. Harrigan for her losses,[7] and Mr. Tarasi and Mr. Sampas each purchased 500 shares of Meridian stock from Ms. Wolff at the price she originally had paid for it. The present lawsuit was then filed in the Western District of Pennsylvania.

After extensive discovery, the defendants moved for summary judgment. In granting their motions, Judge Willson ruled that the plaintiffs were *in pari delicto* and thus could not recover, even if they could prove that Mr. Mialki had violated the securities laws. This appeal followed. And we now affirm the judgment of the district court.

## II.

Initially, we are confronted with plaintiffs' contention that summary judgment was improper because disputed issues of material fact remained to be resolved.

It is true that several controverted factual matters existed at the time of Judge Willson's ruling. In particular, Mr. Mialki denied that he had told the plaintiffs about the Paragon-Meridian merger or that he had even recommended the purchase of Meridian stock.

■ Nonetheless, we are unable to agree with the proposition advanced by the plaintiffs. The inquiry mandated by Rule 56 is not whether any issues of fact remain. Rather, it is whether issues of *material* fact are in dispute.[8] In this case, the contested issues of fact pertain to the question whether Mr. Mialki had violated the securities laws. But there was no disagreement as to the factual matters which bear on the defense of *in pari delicto*. This is so since it is undisputed that none of the plaintiffs made disclosure, in connection with their purchases of Meridian securities, of the inside information which they claimed they possessed.

The import of these considerations is that, if the defense of *in pari delicto* is applicable in securities fraud cases, Judge Willson did not err in concluding that the defendants would still be entitled to a verdict as a matter of law even if plaintiffs prevailed as to every disputed factual issue.

We thus turn to the central issue in this appeal—whether *in pari delicto* is a proper defense in suits brought under section 10(b) and rule 10b–5.

## III.

■ *In pari delicto*, which literally means "of equal fault," is one of the common law doctrines fashioned to assure that transgressors will not be allowed to profit from their own wrongdoing.[9] Under this con-

---

6. Mr. Mialki, in his deposition, stated that he believed that the merger went through on an interim basis, but that it was later rescinded. He stated that he did not know the reasons for the rescission. *See* App. at 63a–64a.

7. It is possible that, on account of the reimbursement, Mrs. Harrigan no longer has a claim against the defendants. We do not, of course, express any opinion about that question.

8. *See, e. g., Sound Ship Building Corp. v. Bethlehem Steel Co.*, 533 F.2d 96, 100 (3d Cir. 1976); *Teamsters Local 249 v. Bill's Trucking, Inc.*, 493 F.2d 956, 964 (3d Cir. 1974); *Kiess v. Eason*, 442 F.2d 712, 713 (7th Cir. 1971).

9. A companion principle is the equitable notion of "unclean hands." Under that doctrine, a party will not be able to obtain equitable relief if he himself has engaged in misconduct. *See, e. g., Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806,

struct, a party is barred from recovering damages if his losses are substantially caused by "activities the law forbade *him* to engage in." [10]

The rule has developed many complexities and has been applied where plaintiffs have had only a minimal association with the allegedly unlawful acts.[11] However, when *in pari delicto* is given a narrow interpretation, the scrutiny of the relative moral worth of litigants that it allows is a limited one. Only in those cases where it can fairly be said that the plaintiffs' fault is substantially equal to that of the defendant will recovery be precluded.[12] Moreover, a court may look only to conduct associated with the transaction before it, and may not forbid recovery on account of a plaintiff's activities in a separate setting.

Because the doctrine occasionally has been applied in a sweeping fashion, it has been questioned whether *in pari delicto* is consonant with the mechanism of enforcement of regulatory statutes through private damage suits.[13] This issue, in the context of treble damage actions under the antitrust laws, came before the Supreme Court in *Perma Life Mufflers, Inc. v. International Parts Corp.*[14]

*Perma Life* was a suit brought by a number of Midas Muffler dealers against Midas and its parent corporation. Various antitrust violations were alleged. The focus of the litigation was the Midas dealership agreement, which contained provisions such as tie-ins, resale price maintenance, exclusive dealing arrangements and territorial restrictions, that purportedly abridged the antitrust laws.

The district court and the court of appeals[15] ruled for the defendants on the ground of *in pari delicto*. Since the plaintiffs had accepted the challenged agreement and had obtained benefits through their association with Midas, the trial and appellate courts reasoned that they would not be heard to assert that these contracts were tainted by illegality.

Such reasoning was rejected by the Supreme Court. The case produced five opinions, with Justice Black authoring the lead opinion. Justice Black's starting point was his perception of "the inappropriateness of invoking broad common-law barriers where a private suit serves important public purposes." [16] *Perma Life* implicated this concern since the lower courts had apparently given *in pari delicto* a free-wheeling interpretation in applying it to the plaintiffs in that case. Although the conduct of the plaintiffs may have been "morally reprehensible," Justice Black continued, the provision in the Clayton Act for treble damages was strong evidence that Congress believed that enforcement of the national antitrust policy was paramount.[17]

Moreover, he added, the record in *Perma Life* suggested that the plaintiffs could not be said to be equally responsible for the illegal features of the dealership agree-

---

814–15, 65 S.Ct. 993, 89 L.Ed. 1381 (1945); *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 244–45, 54 S.Ct. 146, 78 L.Ed. 293 (1933); *Gaudiosi v. Mellon*, 269 F.2d 873, 881 (3d Cir.), *cert. denied*, 361 U.S. 902, 80 S.Ct. 211, 4 L.Ed.2d 157 (1959). Since the plaintiffs in this appeal only seek damages, the "unclean hands" doctrine is not relevant.

**10.** *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 154, 88 S.Ct. 1981, 1992, 20 L.Ed.2d 982 (1968) (Harlan, J., concurring and dissenting) (emphasis in the original).

**11.** *Id.* at 138, 88 S.Ct. 1981 (opinion of Black, J.); Note, *In Pari Delicto and Consent as Defenses in Private Antitrust Suits*, 78 Harv.L. Rev. 1241, 1242 (1965).

**12.** *See Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 147–48, 88 S.Ct.

1981, 20 L.Ed.2d 982 (Fortas, J., concurring); *id.* at 149, 88 S.Ct. 1981 (Marshall, J., concurring); *id.* at 153–54, 88 S.Ct. 1981 (Harlan, J., concurring and dissenting).

**13.** *See, e. g.,* Note, *In Pari Delicto and Consent as Defenses in Private Antitrust Suits*, 78 Harv. L.Rev. 1241 (1965).

**14.** 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968).

**15.** *Perma Life Mufflers, Inc. v. International Parts Corp.*, 376 F.2d 692 (7th Cir. 1967).

**16.** 392 U.S. at 138, 88 S.Ct. at 1984.

**17.** *Id.* at 138–39, 88 S.Ct. 1981.

ment. Plaintiffs merely acquiesced in the suspect provisions in order to gain the benefit of "an otherwise attractive business opportunity." And even if the plaintiffs had "supported" some of these clauses, the evidence showed that Midas was the driving force behind the restrictions.[18] Justice Black concluded by holding that "the doctrine of *in pari delicto*, with its complex scope, contents, and effects, is not to be recognized as a defense to an antitrust action." [19]

The clarity of this holding, however, was somewhat diluted by later portions of his opinion.[20] Justice Black recognized that the defendants had raised another argument, which he termed to be different and "considerably narrower." [21] It was contended that the plaintiffs should be barred from recovery since they had allegedly supported, in an active fashion, the entire anticompetitive apparatus of the dealership agreement. Justice Black, however, reserved the point "whether truly complete involvement and participation in a monopolistic scheme" could form the basis of a defense, since the facts of *Perma Life* in his judgment clearly did not present such a case.[22] The majority in *Perma Life* thus left open the possibility that the conduct of a plaintiff might erect a bar to recovery in suits brought under regulatory statutes.[23]

This conclusion would seem to be fortified by the four other opinions in *Perma Life*.[24] They reveal that five Justices [25] explicitly concluded that they would hold, in some circumstances, that illegal conduct on the part of a plaintiff would prevent him from recovering. Although they differed in terminology, some wishing to retain the rubric of *in pari delicto* and some not,[26] these five Justices essentially agreed as to the rule they would apply: a plaintiff would be barred from obtaining damages in those cases where his fault was relatively equal to that of the defendant.[27]

*Perma Life* thus appears to have restricted consideration of plaintiffs' illegal conduct as a defense without foreclosing cognizance of this factor altogether. A plaintiff's unlawful conduct must be active and significant before it can bar a verdict in his favor. However, *Perma Life* also teaches that prevention of unjust enrichment and protection of the integrity of the courts cannot, by themselves, thwart recovery in private actions under regulatory statutes.

18. *Id.* at 139–40, 88 S.Ct. 1981.

19. *Id.* at 140, 88 S.Ct. at 1985.

20. The difficulty in pin-pointing the precise implications of *Perma Life* has been noted by several commentators. *See, e. g.*, Sullivan, *Antitrust* 783–84 (1977); *The Supreme Court, 1967 Term*, 82 Harv.L.Rev. 63, 260–66 (1968). *But see* Comment, *The Demise of In Pari Delicto in Private Actions Pursuant to Regulatory Schemes*, 60 Calif.L.Rev. 572 (1972).

21. 392 U.S. at 140, 88 S.Ct. 1981.

22. *Id.* at 140–41, 88 S.Ct. 1981.

23. *See, e. g.*, Sullivan, *Antitrust* 783–84 (1977); Comment, *Securities Regulation: Doctrines of* In Pari Delicto *and Unclean Hands Held to Bar 10b–5 Recovery by Tippee Against Corporate Insider*, 1969 Duke L.J. 832, 838 (1969).

24. 393 U.S. at 142, 88 S.Ct. 1981 (White, J., concurring); *id.* at 147, 88 S.Ct. 1981 (Fortas, J., concurring); *id.* at 140, 88 S.Ct. 1981 (Marshall, J., concurring); *id.* at 153, 88 S.Ct. 1981 (Harlan, J., concurring and dissenting).

25. Justice Stewart joined Justice Harlan's opinion.

26. Justice White agreed with the majority that "the *in pari delicto* defense in its historic formulation is not a useful concept for sorting out those situations in which the plaintiff might be barred because of his own conduct from those in which he may have been a party to an illegal venture but is still entitled to damages from other participants." *Id.* at 143, 88 S.Ct. at 1987 (White, J., concurring). He would rely, instead, on the concept of causation. *Id.* at 143–44, 88 S.Ct. 1981 (White, J., concurring). The other concurring Justices would retain some form of the *in pari delicto* concept. *See id.* at 147, 88 S.Ct. 1981 (Fortas, J., concurring); *id.* at 148–49, 88 S.Ct. 1981 (Marshall, J., concurring); *id.* at 153–54, 88 S.Ct. 1981 (Harlan, J., concurring and dissenting).

27. *See id.* at 146, 88 S.Ct. 1981 (White, J., concurring); *id.* at 147–48, 88 S.Ct. 1981 (Fortas, J., concurring); *id.* at 149, 88 S.Ct. 1981 (Marshall, J., concurring); *id.* at 153–55, 88 S.Ct. 1981 (Harlan, J., concurring and dissenting).

Accordingly, before denying recovery to a plaintiff, a court must carefully assess the impact of such a result on the enforcement of statutory schemes.[28] This we shall now proceed to do.

## IV.

Few cases have considered the ramifications of *Perma Life* upon the place of *in pari delicto* in private suits under rule 10b–5.[29] And the extant authorities are divided in the results they reach. The Fifth Circuit, in a line of cases beginning with *Kuehnert v. Texstar Corp.*,[30] has ruled that the doctrine of *in pari delicto* bars "tippee" suits against "tippers," whereas Judge Weinfeld of the Southern District of New York, in *Nathanson v. Weis, Voisin, Cannon, Inc.*,[31] has concluded that the defense is inapplicable. The difficulty of our assignment in this case has been substantially alleviated by the careful analyses set forth by these tribunals.[32]

*Kuehnert* and *Nathanson* present factual patterns relatively similar to the one before us here. "Tippees" were given inside information about certain corporations; they purchased securities in reliance thereon; they did not disclose the information that had been provided to them; the tips turned out to be misleading; and the "tippees" then sued their sources of information.

The *Kuehnert* court, in an opinion by Judge Aldrich,[33] held that such a suit was barred by *in pari delicto*. Judge Aldrich noted that "tippees," although not technically insiders, have a duty under rule 10b–5 to disclose any inside information when making a purchase or sale.[33a] He recognized, however, that in a strict sense, Kuehnert was not a "tippee" since the tip he had received was not accurate and he had not withheld material information from his vendors. Even so, Judge Aldrich concluded, this should make no difference inasmuch as the prohibitions of rule 10b–5 extended to

---

28. *See* Comment, *The Demise of In Pari Delicto in Private Actions Pursuant to Regulatory Schemes*, 60 Calif.L.Rev. 572, 575 (1972).

29. Several useful commentaries on this problem have appeared. See, *e. g.* Bell, *How to Bar an Uninnocent Investor—The Validity of Common Law Defenses to Private Actions Under the Securities Exchange Act of 1934*, 23 U.Fla. L.Rev. 1 (1970); Ruder, *Multiple Defendants in Securities Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification and Contribution*, 120 U.Pa.L.Rev. 597, 659–64 (1972); Comment, *supra* note 28; Comment, *supra* note 23; Comment, *Plaintiff's Conduct as a Bar to Recovery Under the Securities Acts*: In Pari Delicto, 48 Tex.L.Rev. 181 (1969); Comment, 40 Ford.L.Rev. 725 (1972); Comment, 33 U.Pitt.L.Rev. 103 (1971); Comment, 11 B.C.Comm. & Ind.L.Rev. 257 (1970); Comment, 58 Calif.L.Rev. 1149 (1970).

Section 1420(d) of the proposed Federal Securities Code of the American Law Institute would recognize the defense of *in pari delicto* in specified circumstances. Thus, before permitting the invocation of the defense under the proposed Code, a court should consider: (1) the deterrent effect of the particular type of liability; (2) the financial and legal sophistication of the parties; and (3) their relative responsibility for the loss incurred.

30. 412 F.2d 700 (5th Cir. 1969); *See also James v. DuBreuil*, 500 F.2d 155 (5th Cir. 1974). One other case indicates that *in pari delicto* is available as a defense to private rule 10b–5 actions. In *Wohl v. Blair & Co.*, 50 F.R.D. 89

(S.D.N.Y.1970), Judge Mansfield denied a motion to strike the defense of *in pari delicto*, since the defense raised "serious and substantial legal issues." *Id.* at 93.

31. 325 F.Supp. 50 (S.D.N.Y.1971).

32. Several other cases have considered whether *in pari delicto* is available in private suits brought under the securities laws. *See, e. g., Woolf v. S. D. Cohn & Co.*, 515 F.2d 591 (5th Cir. 1975), vacated and remanded, 426 U.S. 944, 96 S.Ct. 3161, 49 L.Ed.2d 1181 (1976) (10b–5 suit alleging failure to reveal that securities were not registered); *Pearlstein v. Scudder & German*, 429 F.2d 1136 (2d Cir. 1970), *cert. denied*, 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971) (Regulation T); *Serzysko v. Chase Manhattan Bank*, 290 F.Supp. 74 (S.D.N.Y.), *aff'd per curiam*, 409 F.2d 1360 (2d Cir. 1968), *cert. denied*, 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180 (1969) (Regulation U); *Can-Am Petroleum Co. v. Beck*, 331 F.2d 371 (10th Cir. 1964) (suit under Securities Act alleging sale of unregistered securities).

33. Judge Aldrich was sitting in the Fifth Circuit by designation. His opinion was joined by Judge Dyer. Judge Godbold dissented in an opinion that presaged many of the arguments presented by Judge Weinfeld in *Nathanson*.

33a. *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968).

attempted as well as consummated frauds. Moreover, but for the fortuity of the inaccuracy of the tip, Kuehnert would have succeeded in taking advantage of the unsuspecting sellers who had not been made aware of the inside information.[34]

Judge Aldrich then assessed the impact of *Perma Life*, and found it distinguishable on several counts. Suits by "tippees" against "tippers," he suggested, did not bear on the public interest to the same degree as antitrust treble damage suits since "tippee" suits merely concern "accounting[s] between joint conspirators."[35] Moreover, the *Kuehnert* court noted that *Perma Life* left open the possibility that "a true co-conspirator may be deprived of recovery even under the Sherman Act."[36] Judge Aldrich went on to urge that Kuehnert's behavior was of a different sort than the passive acceptance of illegality that the Supreme Court detected in *Perma Life*. Kuehnert's conduct in failing to disclose the inside information was active and voluntary and could not be attributed, as in *Perma Life*, to economic duress and unequal bargaining power.[37] Consequently, the court concluded, the case revealed the proper predicate for invocation of *in pari delicto*.

It was recognized, however, that under *Perma Life*, even this was not enough to bar a plaintiff's recovery without considering the effect of such a rule on the enforcement of public policy. The *Kuehnert* court stated that:[38]

> The question must be one of policy: which decision will have the better consequences in promoting the objective of the securities laws by increasing the protection to be afforded the investing public.

Disallowing the *in pari delicto* defense, the Court conceded, would have some effect in discouraging insiders from giving tips.

However, suits by the SEC and ultimate purchasers and sellers had placed substantial pressure on insiders, and the paucity of "tippee" suits to that date had not stunted the efficacy of rule 10b–5.[39]

Moreover, the non-availability of *in pari delicto* would have a deleterious impact on securities law enforcement the Fifth Circuit stated. Under such a regime, it contended, a "tippee" would have in effect a warranty as to the truth of the information. If his tip were false he could recover damages from his informer. And if it were true, he would be able in all probability to retain his profits since his purchaser or seller would probably encounter insurmountable difficulties in tracing the "tippee." The *Kuehnert* court concluded that it would be best to deal with the "tippee" problem and to permit the invocation of *in pari delicto*, in order to place a restraint on the use of inside information by "tippees."[40]

In *Nathanson*, Judge Weinfeld examined the same factors that had been explored in *Kuehnert*. His scrutiny, however, departed from that of the Fifth Circuit in two important respects and thus yielded a different result.

First, Judge Weinfeld did not believe that "tippees" could be said to bear the same degree of fault as "tippers," which suggested to him that *in pari delicto* should not be applied to them under the principle of *Perma Life*. Equality of fault could not be found because "tippers," generally insiders, posed a greater threat to the investing public than "tippees." This is so, Judge Weinfeld claimed, since the "tipper" as "the fountainhead" of inside information creates the possibility of "tippee" violations by making the initial disclosure.[41]

The critical position occupied by the "tipper" in the flow of inside information also

**34.** 412 F.2d at 702–03.

**35.** *Id.* at 703. *See also James v. DuBreuil*, 500 F.2d 155, 160 (5th Cir. 1974).

**36.** 412 F.2d at 703.

**37.** *Id.* at 703–04.

**38.** *Id.* at 704.

**39.** *Id.* at 705.

**40.** *Id. See also Wohl v. Blair & Co.*, 50 F.R.D. 89, 92–93 (S.D.N.Y.1970).

**41.** 325 F.Supp. at 57.

shaped Judge Weinfeld's second variance from the analysis set forth in *Kuehnert.* His assessment of the impact on enforcement of the securities laws of the allowance or disallowance of *in pari delicto* was somewhat different from that put forward by Judge Aldrich. Although recognizing the damage that "tippees" could inflict on the investing public, Judge Weinfeld stated that the most appropriate reaction would be to place maximum pressure on insiders by not permitting *in pari delicto* as a defense. This, he asserted, would discourage the initial release of inside information and would thus nip in the bud the potentiality of further violations.[42]

With the opinions by Judges Aldrich and Weinfeld forming the backdrop, we now turn to our own analysis of the problem presented by the case at hand.

## V.

Our first task is to determine whether the unlawful conduct of the plaintiffs here is of sufficient magnitude, when compared to the derelictions of the defendants, to establish the foundation for the application of *in pari delicto.* We conclude that it does.

There is no dispute regarding the nature of the securities law violations committed by the plaintiffs. As "tippees", they were under an obligation either to make full disclosure before engaging in transactions on the open market or to refrain from trading until such information was made public.[43] And it is clear that they did not reveal the possibility of a Paragon-Meridian merger. Moreover, there has been no intimation that the plaintiffs' conduct in purchasing Meridian securities and not making disclosure was anything but voluntary.

Mr. Mialki and the Bank, in contrast, have allegedly committed two distinct violations of rule 10b–5. The first is the one of which plaintiffs complain—namely, the purportedly false and misleading statements made by Mr. Mialki about the Paragon-Meridian merger. The other is the illegality against which we must measure the conduct of the plaintiffs: the selective release of inside information to a chosen few "tippees."

*Perma Life* provides the framework for this discussion. The opinions in that case establish the rule that a plaintiff may be deprived of a recovery only if his fault is substantially equal to that of defendant.[44] Applying this yardstick to the somewhat different context of suits brought under rule 10b–5, though, is not a simple assignment.

Antitrust cases in which defendants seek to invoke *in pari delicto* provide relatively straightforward settings for measuring the relative fault of the parties. The plaintiff, as in *Perma Life*, has ordinarily done business with the defendant and is party to an agreement with the defendant. Such agreement is usually the basis of the alleged illegal conduct of both parties, and the issue to be resolved is whether the plaintiff involuntarily assented to the illicit arrangement or whether he actively participated in the formulation of the unlawful scheme.[45]

Securities cases such as the one before us do not usually fit into this mold. The infractions of the parties—the release of inside information by the "tipper" and its use by the "tippee"—are linked,[46] but they are

---

42. *Id.* at 57–58.

43. *See, e. g., Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 495 F.2d 228 (2d Cir. 1974); *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 848 (2d Cir. 1968), *cert. denied sub nom. Kline v. SEC,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); *Ross v. Licht,* 263 F.Supp. 395, 410 (S.D.N.Y.1967); A. Bromberg, *Securities Law: Fraud, SEC Rule 10b–5* 190.13–190.-20 (1973); 3 L. Loss, *Securities Regulation* 1451 (1961).

44. *See* note 27 *supra.*

45. *See* Sullivan, *Antitrust* 783–84 (1977); Note, *In Pari Delicto and Consent as Defenses in Private Antitrust Suits,* 78 Harv.L.Rev. 1241 (1964).

46. This is not to suggest that use of inside information by "tippees" is a prerequisite, in all contexts, for a finding of "tipper" liability. *See* A. Bromberg, *Securities Law: Fraud, SEC Rule 10b–5* at 190.9–190.10 (1973). However, it is

not based upon an agreement between the parties. Since it is ordinarily not alleged that the defendant coerced the plaintiff into entering into securities transactions, and since comparisons of bargaining power are irrelevant, it is more difficult to give content to the notion of equality in such a context.

In our view, however, the reasons behind the adoption of the equality benchmark suggest that the plaintiffs and the defendants here should be deemed to be of substantially equal fault in causing the loss of which plaintiffs complain. It is true that the parties are not co-conspirators in the usual sense, since a joint program of illegal conduct was never agreed upon or even contemplated.[47] Nonetheless this litigation contains an important element, absent in *Perma Life*, that, we believe, makes it an instance of joint participation in wrong-doing—specifically, voluntary illegal conduct on the part of the plaintiffs.

*Perma Life* emphasized the fact that the participation by the plaintiffs in the unlawful agreement was passive, and perhaps coerced.[48] Applying *in pari delicto* to such plaintiffs would not at all serve the purposes of the antitrust laws, since no deterrence of future violations could be expected while the effectiveness of treble damage actions might be undermined.[49]

■ The fact that the plaintiffs in this case willingly committed illegal acts would seem to obviate these concerns to a substantial degree. Deciding that "tippees" might be said to be *in pari delicto* with "tippers" is not necessarily repugnant to the aims of the securities laws. Indeed, as we shall indicate, it would actually have the effect of deterring "tippee" violations. Moreover, it should be noted that the voluntary illegal activities of the plaintiffs present a serious threat to the investing public, which the securities laws seek to prevent. Finally, the voluntary acts of the plaintiffs may fairly be said to be a sine qua non of their losses: but for their purchases of Meridian securities, they would not have suffered any injury. Thus, we conclude that the prohibited conduct of the plaintiffs is of sufficient magnitude and has a sufficient causal relation with their losses to bring into play the concept of *in pari delicto*, as it was refined by *Perma Life*.[50]

■ This, however, does not complete our inquiry. For *Perma Life* teaches that *in pari delicto* should not be applied mechanically when the public interest is present. Rather, it is necessary to assess the impact upon the enforcement of a regulatory system before sanctioning its application. After careful deliberation we conclude that the considerations in this case are sufficiently distinct from *Perma Life* so as to

---

through the use of inside information that the evil that rule 10b–5's prohibition against tipping aims to prevent—unequal access to material information—is visited upon the general investing public.

47. *James v. DuBreuil*, 500 F.2d 155 (5th Cir. 1974); did present a suit under rule 10b–5 where the parties could be considered co-conspirators. As Judge Ainsworth noted in his opinion, see *id.* at 160, a situation such as that provides the strongest case for invocation of *in pari delicto*.

48. *See* 392 U.S. at 140–41, 88 S.Ct. 1981; *id.* at 147, 88 S.Ct. 1981 (White, J., concurring); *id.* at 148, 88 S.Ct. 1981 (Fortas, J., concurring). *See generally,* Note, *In Pari Delicto and Consent as Defenses in Private Antitrust Suits,* 78 Harv.L.Rev. 1241 (1965).

49. *See* 392 U.S. at 142–47, 88 S.Ct. 1981 (White, J., concurring).

50. In his opinion in *Nathanson,* Judge Weinfeld suggested that the degrees of fault attributable to "tippers" and "tippees" cannot be said to be equal. The crux of his position appears to be the contention that "tippers," being the "fountainhead" of inside information, pose a greater danger to the investing public than do "tippees". *See* 325 F.Supp. at 57.

Although we acknowledge that this factor is relevant in determining whether application of *in pari delicto* is consonant with enforcement of public law norms, we do not believe that it is apposite in measuring relative degrees of fault. It is true that the inquiry as to equality of fault is informed to some degree by enforcement considerations. But the focus in our view should be a narrower one, concentrating on the extent to which the acts of plaintiffs and defendants can be said to be substantial causes of the injury suffered by the plaintiffs.

allow the invocation of the doctrine of *in pari delicto* against the "tippees" here.

The *Perma Life* situation was one in which the element of enforcement pointed to the inapplicability of *in pari delicto*. Its use, in such circumstances, would not serve to deter potential lawbreakers and would reduce the pool of private attorneys general.[51] In the instant case, however, the concern of enforcement cuts both ways. Both the defendants and the plaintiffs have contravened rule 10b–5, and a decision to disallow *in pari delicto* will have some deterrent impact on potential "tippers," while its application could lessen the possibility that a "tippee" will use such information in an illegal manner. The question before us, as indicated by the *Kuehnert* and *Nathanson* courts, is which alternative will best serve the policies that undergird the securities laws.[52]

Barring *in pari delicto* and allowing a "tippee" to recover, would have the effect, to some degree, of creating an additional reason for those possessing inside information not to give tips. This is so since insiders would be aware that if their tips turned out to be inaccurate, they could be liable to the "tippees."[53] Judge Weinfeld, in *Nathanson*, insisted that such was the preferable course since it places pressure on the source of inside information. This strategy, if successful, would diminish the problem of "tippee" violations, since the "tipper" would be discouraged from initiating the first step in the chain, the issuance of the tip.[54]

Although the argument is not without strength, the enforcement pressure that non-recognition of *in pari delicto* would engender through incremental deterrence of "tippers" is, in our judgment, outweighed by the prophylactic impact on the use of inside information that allowance of the defense will lead to.

Elimination of *in pari delicto* would not seem to augur a substantial reduction in the flow of inside information. The absence of this defense would have the greatest impact on deliberate purveyors of false information since they would be liable to "tippees." The result of authorizing "tippee" recoveries against tippers, who believe their tips to be true, is less certain. Particularly in light of the holding in *Ernst & Ernst*[54a] that a showing of scienter is a prerequisite to private recoveries under rule 10b–5, it is questionable whether such "tippers" would be forestalled from spreading inside information by the threat of "tippee" suits. Thus, "tippee" suits would not appear to provide a particularly effective tool with which to abate the flow of inside information.[55]

In contrast, permitting *in pari delicto* could have a more telling effect on "tippee" conduct. As Judge Aldrich noted in *Kuehnert*, the danger of eliminating *in pari delicto* is that such a stance would give "tippees" almost no incentive to forebear from using inside information. This is so since if the suggested purchase proved unprofitable, the "tippee" might have recourse against his "tipper" on account of the inaccurate leak.[56] The threat of application of *in pari delicto* would eliminate the warran-

---

**51.** *See* The *Supreme Court, 1967 Term*, 82 Harv.L.Rev. 63, 260–66 (1968).

**52.** We recognize, of course, that this analysis must, to some degree, rest upon non-verifiable observations about the effects of a particular legal rule.

**53.** *See Nathanson v. Weis, Voisin, Cannon, Inc.*, 325 F.Supp. 50, 57–58 (S.D.N.Y.1971); Comment, *The Demise of In Pari Delicto in Private Actions Pursuant to Regulatory Schemes*, 60 Calif.L.Rev. 572, 593–94 (1972).

**54.** 325 F.Supp. at 57–58. After *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), however, such liability is

limited to cases where it is shown that the defendant acted with scienter.

**54a.** *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

**55.** *See* Comment, *Securities Regulation: Doctrines of* In Pari Delicto *and Unclean Hands Held to Bar 10b–5 Recovery by Tippee Against Corporate Insider* 1969 Duke L.J. 832, 839 (1969).

**56.** It should be noted that this suit would be subject to the scienter requirement enunciated in *Ernst & Ernst, supra*.

ty of the accuracy of the tip that might otherwise exist.[57]

Moreover, sanctioning *in pari delicto* and thus opting for additional enforcement pressure on "tippees" rather than upon "tippers" would not substantially detract from the aim of discouraging "tippers" from releasing inside information. As *Kuehnert* pointed out, substantial deterrents to "tippers" are provided by the possibility of SEC and criminal actions and private suits by non-"tippee" purchasers and sellers who have been adversely affected by the dissemination of inside information.[58] And enforcement of the securities laws against putative "tippers" by means of private suits will not be impaired to any great extent since suits by "tippees" are relatively infrequent, especially when compared to the volume of rule 10b–5 suits brought by other classes of plaintiffs.

Finally, in an instance such as here where the enforcement equities are equally balanced, we believe it not improper to take into consideration the factors that form the basis of *in pari delicto* : augmenting the integrity of the courts and preventing wrongdoers from profiting from their misdeeds.[59] Such a course is, in our view, compatible with *Perma Life.* Although Justice Black's opinion expressed doubt whether denying a plaintiff recovery on account of recreant conduct could be squared with the Congressional mandate for private enforcement of the antitrust laws, he held in abeyance the issue whether some private actions might be barred on account of plaintiff's conduct. And five other Justices clearly stated that some plaintiffs would be unable to recover on account of their actions.

The *Perma Life* opinions thus indicate that a limited application of *in pari delicto* can be harmonized with enforcement of the securities laws. Indeed, the case for invocation of this defense would seem to be stronger in the context of the securities laws than in the antitrust field. This is so because private suits under the antitrust laws are provided for by statute while private causes of action under rule 10b–5 are judicially implied. Although private damage actions are important instruments for enforcing the securities laws,[60] it would appear to be more appropriate to engraft limited judicially-fashioned defenses onto judicially-implied causes of action as opposed to Congressional enactments.

We hold, therefore, that *in pari delicto* stands as a bar to the present lawsuit. Accordingly, the judgment of the district court will be affirmed.

---

**57.** See *Kuehnert v. Texstar Corp.,* 412 F.2d 700, 704–05 (5th Cir. 1969); *Wohl v. Blair & Co.,* 50 F.R.D. 89, 92–93 (S.D.N.Y.1970); Comment, *Securities Regulation: Doctrines of* In Pari Delicto *and Unclean Hands Held to Bar 10b–5 Recovery by Tippee Against Corporate Insider,* 1969 Duke L.Rev. 832, 839–40 (1969).

**58.** See 412 F.2d at 705.

**59.** See *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 151, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968) (Marshall, J., concurring); *id.* at 154, 88 S.Ct. 1981 (Harlan, J., concurring and dissenting); Note, *In Pari Delicto and Consent as Defenses in Private Antitrust Suits,* 78 Harv.L.Rev. 1241, 1242 (1965).

**60.** *See J. I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964).