**AMERICAN TRADE PARTNERS, L.P.**

v.

**A–1 INTERNATIONAL IMPORTING ENTERPRISES, LTD.; John G. Cassidy, Sr.; Kevin P. Cassidy; Vincent G. Restivo; Francis R. Santangelo; and Premier International Importing Co., Inc.**

Civ. A. No. 90–3992.

United States District Court,
E.D. Pennsylvania.

Aug. 19, 1991.

Richard L. Scheff, Catherine Pappas, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for ATP.

Sheldon Eisenberger, Joseph Zelmanovitz, Stahl & Zelmanovitz, New York City, for Premier, Restivo and Santangelo.

John G. Cassidy, Sr. and Kevin P. Cassidy, pro se.

## MEMORANDUM AND ORDER

DITTER, District Judge.

This case involves a dispute among four businessmen and arises from the dissolution of a company they ran, the formation of a new company by two of them, and the settlement of claims asserted against them by their factor. It comes before me on a motion to reconsider my dismissal of their cross-claims asserted against each other.

Francis R. Santangelo, Vincent G. Restivo, John G. Cassidy, Sr. ("Jack Cassidy"), and Kevin P. Cassidy were the founders, shareholders, and operators of A-1 International Importing Enterprises, Ltd. Restivo and the Cassidys were primarily responsible for A-1's management on a daily basis. Santangelo initially requested to be excluded from A-1's normal operations and his only responsibility was to use his contacts with The Home Shopping Network ("HSN") to increase A-1's sales to that company. The four shareholders agreed from the outset to submit their personal expenses to A-1 for payment. A-1 paid those personal expenses, but there was no evidence that Santangelo, Restivo, Jack Cassidy, and Kevin Cassidy ever accounted properly for those payments on their personal income tax returns.

To obtain financing for its operations, A-1 sold accounts receivables to plaintiff American Trade Partners, L.P. ("ATP"). In conjunction this factoring arrangement, Restivo and the Cassidys signed personal guarantees for any outstanding delinquencies that were not satisfied by A-1. Santangelo did not sign a guarantee. ATP provided more than $16,000,000 to A-1 over a twenty-two month period. By December, 1989, A-1 owed ATP approximately $1,500,000, an amount it could not pay because, at least in part, of excessive personal expenses charged by the Cassidys to A-1. When Santangelo learned of the amount of these charges, he and Restivo ousted the Cassidys from their financial management positions and eventually from A-1 entirely. At that same time, Santangelo and Restivo formed a new corporation, Premier International Importing Co., Inc., to carry on the business and to profit from Santangelo's contacts at HSN.

ATP was unable to collect its debt, so it brought suit against A-1, its four shareholders, and Premier. ATP's claims against the defendants were settled before trial. The four shareholders also initiated litigation against each other. Jack and Kevin Cassidy filed cross-claims against Santangelo, Restivo, and Premier. Santangelo and Premier countered with cross-claims against the Cassidys. Following a one week bench trial, on July 22, 1991, I made numerous findings of fact, reached conclusions of law, and rejected all of the cross-claims. Two days later, on July 24, 1991, I entered judgment against Santangelo and Premier on their cross-claims and I dismissed the Cassidys' cross-claim. Santangelo, Premier, and Restivo [1] now move for reconsideration of my July 24, 1991, order and certain findings of record.[2] For

---

1. Restivo only seeks reconsideration of those specific factual findings and legal conclusions concerning his conduct during the relevant time period. Restivo, however, is not a cross-claim plaintiff and, of course, does not seek reconsideration of my decision dismissing the Cassidys' cross-claim asserted against him. His motion for reconsideration incorporates Santangelo's and Premier's motion in its entirety. The memorandum that accompanies Santangelo's and Premier's motion is, for the most part, silent as to Premier. For these reasons, I will refer to Santangelo only in the remainder of this memorandum.

2. At the close of the trial, I informed Santangelo's and Restivo's counsel that I did not intend

the reasons that follow, their motions will be denied.

Santangelo essentially raises three contentions in his motion for reconsideration. First, he argues he did not violate the income tax laws when he and his fellow shareholders agreed to have and did have A–1 pay for their personal expenses. Second, he maintains he is not *in pari delicto* with the Cassidys because he is a victim of their fraud. Third, he claims I erred when I found wrongful his failure to pay ATP any part of the debt owed by A–1, and his use of the available funds to pay his and the other A–1 shareholder's personal expenses.

Santangelo's contentions are without merit.

■ As for the income tax fraud argument, the phrase "saying so, does not make it so" comes to mind. Santangelo argues he did not intend to violate the income tax laws, because A–1 is a "subchapter S" corporation. I agree that a subchapter S corporation may be operated in such a way that it lawfully advances money for the personal expenses of its shareholders. Here, however, the evidence is clear that Santangelo, Restivo, Jack Cassidy, and Kevin Cassidy had no intention of using A–1 in a legal fashion. Thus, saying the shareholders could lawfully use A–1 to provide for their personal expenses does not

mean that they did. To the contrary, all the evidence suggests just the opposite.

I recognize [3] the many "pass through" benefits of a subchapter S corporation. Subchapter S regulations permit the creation of an account to which a shareholder's personal expenses paid by the corporation may be recorded as a distribution of income. These distributions must be reported on the shareholder's personal tax return. These provisions are applicable to A–1 in the abstract, but that is not how Santangelo, Restivo, Jack Cassidy, and Kevin Cassidy ran A–1.

The record here permits only one conclusion: from day one, Santangelo, Restivo, Jack Cassidy, and Kevin Cassidy intended to operate A–1 illegally. N.T. 7/22/91 at 4, 17, and 18. They intentionally had A–1 pay their personal expenses and made no effort to reimburse A–1 or have appropriate charges made to their distribution accounts. *Id.* They used A–1 to pay the cost of limousines, luxury cars, personal travel, personal entertainment, home furnishings, and many other accoutrements of the good life. There was no evidence any of them ever separated their personal from business expenses or paid income taxes on the personal expenses picked up by A–1.

It is incredible for Santangelo to assert he intended to use the pass through provisions available to A–1. A sophisticated and experienced businessman knows it is far

---

to order the trial transcript. I also informed him I expected him to refer me to particular portions of the transcript for support for his arguments if he intended to file a motion for reconsideration. I allowed him, however, to reserve the right in that motion to file a supplemental brief when he received the trial transcripts. In their motion, Santangelo and Restivo did not refer me to any trial transcript citations, only to the preliminary injunction transcripts. They stated they would like the opportunity to file a supplemental brief upon receipt of the transcripts. I have since learned that they have not ordered the transcript and do not plan to do so. No supplemental brief has been filed. Therefore, I see no reason to delay this matter any further and will rule on their motion based upon my notes of the proceedings. I will provide citations to the transcript of my findings of fact and conclusions of law, because my court reporter provided me with a copy of that portion of the transcript.

3. The testimony concerning A–1's subchapter S status was limited. Santangelo and A–1's accountant mentioned the "pass through" benefit of a subchapter S corporation. Santangelo also introduced A–1's corporate tax returns for 1987 and 1988 and the shareholders' schedule K–1's for those same years. To my recollection that was the extent of the evidence in that regard. There was no statement that capital accounts were formed by the shareholders and no explanation by any expert or layman how a subchapter S corporation allocated personal and business expenses. Nevertheless, I took judicial notice of the subchapter S provisions prior to rendering my decision. As I noted then, and repeat today, Santangelo, Restivo, and the Cassidys had no intention of separating their personal and business expenses, had every intention of using A–1 to pay both, and had every intention of illegally withholding taxes from the United States and New York state governments. *N.T.* 7/22/91 at 17, 18, 24, 26, 32, and 33.

easier to separate his personal from business expenses at the time the expense is incurred. All he needs is two credit cards or two check books; no fancy accounting is required; no ex post facto deliberations are needed. Santangelo not only did not allocate his expenses when they were incurred; he never did. The only conceivable reason he did not do so is because he intended to defraud the United States and New York state. If all his expenses were classified as business-related and paid by A–1, he would not have to include the money A–1 used to pay those personal expenses as income on his personal tax return.

It is equally incredible for Santangelo to assert he was unaware the Cassidys were not allocating his expenses properly. *Id.* at 20 and 31–34. First of all, the Cassidys would have no way of knowing which of Santangelo's expenses were personal or business. There was nothing to suggest Santangelo ever told them. Second, the Cassidys never asked him to separate his bills by expense type. This should have tipped him off that A–1 was paying all the bills he submitted regardless of their relation to A–1's business. Third, a comparison of his profit distributions and his year-end K–1 [4] would have revealed that no personal expenses were allocated to his capital account. *Id.* at 20.

Each of these facts lead to just one conclusion: Santangelo, as well as Restivo, Jack Cassidy, and Kevin Cassidy, did not intend to pass personal expenses through A–1 and, eventually, charge themselves. They intended A–1 to pay everything. Santangelo must have known this was the plan; he benefitted from it and was in on it from the beginning. I will not reverse any of my findings relating to the illicit operation of A–1 by Santangelo, Jack and Kevin Cassidy, and Restivo.

Santangelo next contends he was not *in pari delicto* with the Cassidys. He is mistaken. *"In pari delicto,* which literally means 'of equal fault,' is ... fashioned to assure that transgressors will not be allowed to profit from their own wrongdoing. Under this construct, a party is barred from recovering damages if his losses are substantially caused by 'activities the law forbade him to engage in.' " *Tarasi v. Pittsburgh Nat. Bank,* 555 F.2d 1152, 1156–57 (3d Cir.1977) (quoting *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 154, 88 S.Ct. 1981, 1992, 20 L.Ed.2d 982 (1968)). Additionally, "only in those cases were it can fairly be said that the plaintiffs' fault is substantially equal to that of the defendant will recovery be precluded." *Tarasi,* 555 F.2d at 1157. Santangelo clearly intended to engage in illegal activities, namely, tax fraud and fraud, and his fault with respect to ATP and with respect to the Cassidys is substantially equal to that of the Cassidys. N.T. 7/22/91 at 26–27.

There is no question Santangelo not only intended to violate federal and state income tax laws, but also to perpetuate a fraud on ATP, as did Restivo, Jack Cassidy, and Kevin Cassidy. With regard to ATP, Santangelo and the Cassidys have equal fault. They rendered A–1 unable to pay its debt to ATP in contravention of the accounts purchase agreement, the personal guarantees, and the security agreement. They each did so with fraudulent intent. The Cassidys' fraud occurred prior to their leaving A–1 and Santangelo continued the scheme to defraud in order to frustrate ATP's debt collection efforts. It is of no consequence that each shareholder's wrongful conduct with respect to ATP occurred at different times. The fact remains that these men, each in his own way, operated A–1 to defraud ATP.

**4.** Santangelo maintains that his 1988 K–1 reflected greater distributions than the other shareholders and that this must mean his personal expenses were included as distributions for which he paid personal income tax. The Cassidys assert, Restivo agreed, and Santangelo did not refute at trial, the greater distribution to Santangelo does not reflect an allocation of personal expenses but their agreement that Santangelo would not be responsible for financing costs. Moreover, no one has argued Santangelo separated his personal from business expenses for that taxable year. It is implausible then that Santangelo's additional distributions were related to the allocation of his personal expenses to his capital account, if one existed.

With regard to each other, Santangelo, Jack Cassidy, and Kevin Cassidy (and for that matter, Restivo), are in substantially equal fault. The Cassidys may have charged more in personal expenses to A–1 when they worked there, but Santangelo, once he excluded the Cassidys from A–1, effectively assured he would profit from their absence. He continued to charge personal expenses to the corporation, he paid previously charged personal expenses, he took a salary, and he formed a second corporation in order to take advantage of his relationship with HSN. *Id.* at 7, 13, 14, and 15. He made a conscious decision to avoid the payment of ATP's debt.

Santangelo could have saved A–1, paid ATP, and prospered based on the relationship between himself and HSN. *Id.* at 14 and 21. I conclude he formed Premier and refused to pay ATP because he wanted to exclude the Cassidys from A–1's operations. He harmed the Cassidys in a manner substantially equal to the harm inflicted upon him by the Cassidys. They are *in pari delicto* and their cross-claims for indemnification and contribution are without merit.[5]

■ Lastly, Santangelo seeks to be excused from the consequences of his wrongful conduct after he took over A–1's management in January, 1990. He maintains I am judging him with the wisdom of hindsight and that he acted reasonably under the circumstances in choosing the path out of the forest the Cassidys created. He asserts he did not pay ATP any part of the then-existing $1,500,000 secured debt, because he did not have any proof it was legitimate. Even under the kindest light,

Santangelo cannot be relieved from his actions.

Santangelo's claim that he did not have enough information to verify the ATP debt is not credible. He was presented with ATP's documentation that a $1,500,000 debt had accrued. Robert Taylor, ATP's representative, told him ATP was a secured creditor with a sizable outstanding debt. Santangelo knew of ATP and the approximate size of the debt in late December, 1989, or at least by early, January, 1990. *Id.* at 13. Restivo knew of ATP and its relationship with A–1. *Id.* at 11–12. Santangelo formed Premier on the same day he met with Taylor from A–1. *Id.* at 13. The formation of Premier demands the inference that Santangelo contemplated the use of the new company to frustrate ATP's collection efforts and to exclude the Cassidys from a profitable business.

Santangelo claims he paid Logan Financial Services during this period but not ATP because ATP could not validate the debt to his satisfaction. This assertion rings hollow, however. I do not recall any documents which would have lead Santangelo to believe the Logan debt was any more valid than the ATP debt. For example, Santangelo's exhibit 502, the only document introduced by him relating to Logan's debt, is a letter from Logan's president stating that A–1 owed Logan approximately $1,000,000. There is no supporting documentation attached to that letter and no other evidence has been offered to show that a "valid" debt to Logan existed. Taylor, on the other hand, presented a similar letter to Restivo and Santangelo, a computer printout of A–1's transactions with ATP, and a computer printout of the outstanding

---

5. As I noted in my conclusions of law, Santangelo's ninth cross-claim is for indemnification. *Id.* at 23. I granted judgment in favor of the Cassidys on that claim, because Santangelo is not without active fault with respect to ATP. *Id.* at 23–25. I also stated that the ninth cross-claim could not be construed as a claim for contribution, because Santangelo's cross-claim tracks the language necessary to assert an indemnification claim only. *Id.* at 25. Nonetheless, and merely for the purpose of providing the parties with a complete record, I construed it as a claim for contribution. *Id.* at 25. It is without merit under the doctrine of *in pari*

*delicto. Id.* at 26. It is also substantively without merit for many other reasons. The contribution claim is essentially a claim to enforce an illegal contract among the shareholders to violate the federal and state income tax laws. *Id.* at 27–28. Of course, no such contract can be enforced. Even if it were capable of judicial enforcement, it is too vague to be enforced. *Id.* at 18 and 29. Finally, the doctrine of unclean hands bars the equitable relief, specifically an accounting, sought by Santangelo. *Id.* at 29–30. The Cassidys' sixth cross-claim for contribution failed for these same reasons. *Id.* at 30.

invoices and the amount of money owed by A-1 to ATP. Taylor also met with A-1's shareholders on two occasions to discuss A-1's delinquency. Taylor provided more information to validate his company's creditor status, but Logan was allegedly paid and ATP was not. Santangelo's own testimony confirmed he had not heard of either ATP or Logan prior to his direct involvement in A-1's affairs, but he asserts he promptly paid Logan, even though the reason he offers for not paying ATP seemingly would apply to Logan as well.

Additionally, he does not dispute, nor could he, that he used A-1's money during the debt's pendency to pay the shareholders' personal expenses. More importantly, however, he continued to use A-1 to pay personal expenses that he incurred during this period of time. It is hard for me to imagine more than one reason why Santangelo, a sophisticated businessman, would use A-1's allegedly limited cash supply to pay his personal expenses while the debt to ATP was outstanding. The only explanation I can reach based upon the evidence is that Santangelo planned to use A-1 just as he had in the past: to enrich himself unjustly. He had A-1 pay his personal expenses, he took a significant payment from A-1, authorized "loans" to Restivo, all in the face of ATP's claim that it was owed a significant amount of money. Santangelo did so with the fraudulent intent to frustrate ATP's collection efforts.[6]

Santangelo also urges me to correct the record in three respects. I will do so in only one regard. I inadvertently stated that Santangelo's wife was on A-1's payroll. *Id.* at 7. Linda Santangelo, Santangelo's daughter, was on A-1's payroll, but not his wife.

Santangelo asserts no payments were made by A-1 to bank accounts in Switzerland, other than those held by Logan. I found that A-1's bank records reveal that $200,000 and $150,000 were transferred by wire to the Credit Suisse Bank in Switzerland. *Id.* at 14. Restivo authorized the wire transfers. *Id.* I also found neither Santangelo nor Restivo introduced any documents to support their claim that the payments were to Logan. *Id.* Santangelo now points to Carmine Cornette's testimony in the preliminary injunction hearing and plaintiff's exhibit 66 for proof that those transfers went to Logan. Cornette's testimony merely confirmed that Restivo had ordered money wired to Bank Paribas in Switzerland allegedly for Logan's benefit. Exhibit 66 is just the transfer cover sheet completed by Cornette at Restivo's direction.

This evidence, however, has nothing to do with the wire transfers to Credit Suisse. There has been no evidence, other than Cornette's and Restivo's testimony, which is not credible, that the Credit Suisse transfers were to Logan. Moreover, even the Bank Paribas transfer is subject to some question. The only document purporting to identify Logan as the beneficiary of the transfer was completed at Restivo's request. No confirming documentation has been introduced into the record. I am not persuaded my findings concerning the Credit Suisse transfers were unjustified.

Finally, I agree over $400,000 was deposited into A-1's bank accounts in 1990. I also agree creditors other than ATP received payment from those accounts. My findings reflect as much. *Id.* at 13. The record, however, contradicts Santangelo's assertions that no money went to Premier

---

**6.** Santangelo stresses he was not a guarantor of A-1's debt, did not sign the accounts purchase agreement, and did not know of ATP until after the debt had been incurred. I gather from his brief that it is his contention these facts permitted him to discount ATP's claim and to use A-1's money to pay other creditors and not ATP. This is a strange argument in that it provides an explanation of why Santangelo did not pay ATP. Santangelo used A-1's money to pay off previously incurred personal expenses and personal expenses he continued to incur. It makes per-

fect sense for him to have those debts paid by A-1, rather than to have A-1 pay ATP, because that eliminated the need for him to pay for his own personal expenses. He stood to gain more from the use of A-1's money to pay his personal expenses, because it was less likely that he could be reached by ATP for payment on A-1's debt. The claim that the reason he did not pay ATP was because ATP did not give him enough documentation, is a ruse to cover his obviously self-interested activity.

and no money went to cover expenses incurred in 1990. I see no reason to reiterate the many instances of improper payments A–1 made on Santangelo's behalf and at his or Restivo's direction.

For these reasons, I will deny Santangelo's, Premier's and Restivo's motions for reconsideration.