**Opinions of the United States Court of Appeals for the Third Circuit**



10-9-2001

# Official Committee v. RF Lafferty & Co Inc

Precedential or Non-Precedential:

Docket 00-1157

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Official Committee v. RF Lafferty & Co Inc" (2001). *2001 Decisions.* Paper 228.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/228

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 9, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-1157

OFFICIAL COMMITTEE of UNSECURED CREDITORS,
        Appellant

v.

R.F. LAFFERTY & CO., INC.;
*COGEN SKLAR, L.L.P.

*(Dismissed Pursuant to Court's February 14, 2001 Order)

ON APPEAL FROM THE ORDER
OF THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

(D.C. Civ. No: 00-cv-00519)
District Court Judge: The Honorable Edmund V. Ludwig

Argued on May 31, 2001

Before: SLOVITER, FUENTES, and COWEN, Circuit Judges

(Opinion Filed: October 9, 2001)

        Barbara W. Mather (argued)
        Francis J. Lawall
        Matthew J. Hamilton
        Pepper Hamilton LLP
        3000 Two Logan Square
        18th and Arch Streets
        Philadelphia, PA 1903-2799

        Attorney for Appellant

        Stuart L. Melnick (argued)
        Tanner Propp LLP
        99 Park Avenue
        New York, New York 10016

        Attorney for Appellee

OPINION OF THE COURT

FUENTES, Circuit Judge:

This matter arises out of the bankruptcy of two lease financing corporations, which were allegedly operated as a "Ponzi scheme."[1] Like all such schemes, this one collapsed, leaving numerous investors with significant losses. To operate the scheme, William Shapiro, aided by others, allegedly caused the corporations to issue fraudulent debt certificates, which were then sold to individual investors. When the corporations lost any reasonable prospect of repaying the outstanding debt, they filed for bankruptcy.

A Committee of Creditors, appointed by a bankruptcy trustee, brought claims in the District Court on behalf of the two debtor corporations alleging that third-parties had fraudulently induced the corporations to issue the debt securities, thereby deepening their insolvency and forcing them into bankruptcy. These third-parties allegedly conspired with the debtors' management, who were also the

_____

1. A "Ponzi scheme" is "[a] fraudulent investment scheme in which money contributed by later investors generates artificially high dividends for the original investors, whose example attracts even larger investments." Black's Law Dictionary 1180 (7th ed. 1999).

2

debtors' sole shareholders, in engineering the Ponzi scheme. On these allegations, the District Court concluded that it could not rule out the possibility of a cognizable injury. Nevertheless, the District Court held that the Committee lacked standing to assert its claims against the third-parties because of the doctrine of in pari delicto. The Committee appeals.

We conclude that "deepening insolvency" constitutes a valid cause of action under Pennsylvania state law and that the Committee therefore has standing to bring this action. However, evaluating the Committee's claims "as of the commencement" of the bankruptcy, we hold that because the Committee, standing in the shoes of the debtors, was in pari delicto with the third parties it is suing, its claims were properly dismissed. Accordingly, we will affirm the judgment of the District Court.

I.

The following allegations are taken from the Amended Complaint of the appellant, the Official Committee of Unsecured Creditors ("the Committee"), which was appointed by the bankruptcy trustee and which was authorized by stipulation to assert claims on behalf of the debtor corporations. The essence of the Committee's allegations is that the Shapiro family (or "the Shapiros"), with the assistance of other defendants, including third-party professionals,[2] operated Walnut Equipment Leasing Company, Inc., ("Walnut"), and its wholly owned subsidiary, Equipment Leasing Corporation of America ("ELCOA"), as a Ponzi scheme.

The scheme originated with Walnut, which was owned by defendant Walnut Associates, Inc., and which, in turn, was owned by William Shapiro. In 1986, Walnut was

_____

2. The sixteen defendants in the original case before the District Court are as follows: (1) William Shapiro, (2) Kenneth Shapiro, (3) DelJean Shapiro, (4) Lester Shapiro, (5) Nathan Tattar, (6) Adam Varrenti, Jr., (7) John Orr, (8) Philip Bagley, (9) Walnut Associates, Inc., (10) Welco, Inc., (11) The Law Offices of William Shapiro, Esq., P.C., (12) Financial Data, Inc., (13) Kenner Collection Agency, Inc., (14) Cogen, Sklar, L.L.P., (15) R.F. Lafferty & Co., Inc., and (16) Liss Financial Services, Inc.

3

experiencing financial difficulties. As a result, Walnut could not raise sufficient capital through the sale of debt securities. In a purported effort to secure more capital for Walnut, the Shapiro family organized ELCOA as "a limited purpose financing subsidiary," wholly owned by Walnut, to provide a platform to sell debt securities through a new company with a clean financial picture.

According to the Amended Complaint, ELCOA was fraudulently marketed as an independent business entity, even though its only function was to acquire leases from Walnut and to sell debt certificates to raise money. In reality, Walnut and ELCOA were part of a network of businesses owned and operated by the Shapiro family. This network included defendants Welco, Inc., The Law Offices of William Shapiro, Esq., P.C., Walnut Associates, Inc., Financial Data, Inc., and Kenner Collection Agency, Inc. As part of the scheme to keep this network afloat, the Shapiros allegedly misstated Walnut and ELCOA's financial position in order to induce these companies to register, offer, and sell additional debt certificates to raise capital. Numerous investors purchased the ELCOA debt securities, and the Committee claims that the Shapiros funneled those monies into Walnut. At the same time, the Shapiros and their co-conspirators continued receiving salaries and fees from Walnut and ELCOA. Moreover, the issuance of debt securities allegedly deepened the insolvency of Walnut and ELCOA, and put them on the path to bankruptcy.

The Amended Complaint states that certain third-party professionals were essential to the Shapiro family's operation, namely, their counsel, defendant William Shapiro, Esq. P.C., their accountant, defendant Cogen Sklar, L.L.P. ("Cogen"), and their qualified independent underwriters, defendant R.F. Lafferty & Co., Inc. ("Lafferty"), and defendant Liss Financial Services, Inc. ("Liss"). Each of these parties was responsible for professional opinions that served as prerequisites for the registration of each public offering and sale of ELCOA's debt securities. Each allegedly conspired with the Shapiro family to render opinions replete with multiple fraudulent misstatements and material omissions concerning Walnut and ELCOA's financial statements. The parties allegedly lacked any foundation for their conclusions.

4

Ultimately, the artifice collapsed, leading to the bankruptcies of Walnut and ELCOA, which became the debtor corporations (or "the Debtors"). The companies filed Chapter 11 petitions, and the Debtors' management, which included members of the Shapiro family and their co-conspirators, were removed. The Bankruptcy Court then appointed a bankruptcy trustee. Thereafter, the trustee, pursuant to section 1102 of the Bankruptcy Code, 11 U.S.C. S 1102, appointed the Committee to represent the claims of unsecured creditors in connection with the bankruptcy proceedings. The Committee is comprised entirely of creditors; no member of the Debtors' former management is present.

On January 19, 1999, the Bankruptcy Court approved a Stipulation between the Committee and the Debtors authorizing, among other things, "the Committee to commence and prosecute . . . [l]itigation on behalf of the Debtors' estates." Stipulation Among the Debtors and the Official Committee of Unsecured Creditors of the Debtors Authorizing the Committee to Commence Litigation on Behalf of the Debtors' Estates, Bankr. No. 97-19699-DWS, at *2 (Bankr. E.D. Pa. Jan. 19, 1999). Under the Stipulation, the Committee effectively acquired all the attributes of a bankruptcy trustee for purposes of this case. See In re The Mediators, Inc., 105 F.3d 822, 826 (2d Cir. 1997) ("[T]he Committee, while not a trustee in bankruptcy, is in a position analogous to a trustee because it is suing on behalf of the debtor.").

On February 1, 1999, the Committee, on behalf of the Debtors' estates, commenced a civil action in the District Court for the Eastern District of Pennsylvania against the Debtors' officers, directors, affiliated companies (the Shapiro family and their network of companies), and outside professionals (Cogen and Lafferty) on the ground that the defendants, through their mismanagement of the Debtors and their participation in a fraudulent scheme, had "wrongfully expanded the [D]ebtors' debt out of all proportion of their ability to repay and ultimately forced the [D]ebtors to seek bankruptcy protection." The Committee brought claims against the Shapiros and their alleged co-conspirators -- including Cogen and Lafferty -- based upon

5

violations of federal securities laws, as well as common law fraud and negligent misrepresentation, mismanagement and breach of fiduciary duty, breach of contract, professional malpractice, and aiding and abetting breach of fiduciary duty. In addition, the Committee brought claims against some defendants -- DelJean Shapiro, Lester Shapiro, Adam Varrenti, Jr., John Orr, and Philip Bagley -- in their capacity as directors of either Walnut or ELCOA or both, asserting that they had mismanaged and breached their fiduciary duties to the Debtors by allegedly failing to supervise and oversee the Debtors' affairs.

All defendants (except Liss, who failed to appear) moved to dismiss the Committee's Amended Complaint or, alternatively, for summary judgment. On September 8, 1999, the District Court dismissed the claims against Cogen and Lafferty, reasoning that, "[s]ince it is pleaded that the [D]ebtors, acting through the Shapiros, perpetrated the Ponzi scheme . . . the doctrine of in pari delicto . . . bars [the Committee] from suing these defendants for claims arising out of the fraud." Official Committee of Unsecured Creditors v. William Shapiro, et al., No. 99-526, slip op. at 11 (E.D. Pa. Sept. 8, 1999). At the same time, however, the District Court denied the motion to dismiss as to the other defendants on the ground that in pari delicto did not preclude claims against corporate insiders. Id. at 12. Thereafter, the court severed the Committee's claims against Cogen and Lafferty, and the Committee appealed the dismissal of those claims. Cogen has settled with the Committee, leaving Lafferty as the only appellee.

II.

The District Court had subject matter jurisdiction over the case under 28 U.S.C. SS 1331 and 1334(b). We have jurisdiction to hear the appeal under 28 U.S.C.S 1291.

We have plenary review over the District Court's dismissal of the Committee's claims against Lafferty. See Maio v. Aetna, Inc., 221 F.3d 472, 481-82 (3d Cir. 2000). We apply the same standard used by the District Court, namely, we must determine whether, under any reasonable reading of the pleadings, the Committee may be entitled to

6

relief, accepting as true all well pleaded allegations in the Amended Complaint and drawing all reasonable inferences in favor of the Committee. Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996). The District Court's order granting the motion to dismiss will be affirmed only if it appears that the Committee can prove no set of facts that would entitle it to relief. Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

III.

As a preliminary matter, we believe that the District Court's conception of the standing issue in this case was somewhat flawed. The District Court stated that both cognizable injury and the doctrine of in pari delicto were elements of the standing analysis. Official Committee of Unsecured Creditors, No. 99-526, slip op. at 6. This formulation, however, was incorrect. In general,"[s]tanding consists of both a `case or controversy' requirement stemming from Article III, Section 2 of the Constitution, and a subconstitutional `prudential' element." See The Pitt News v. Fisher, 215 F.3d 354, 359 (3d Cir. 2000). An analysis of standing does not include an analysis of equitable defenses, such as in pari delicto. Whether a party has standing to bring claims and whether a party's claims are barred by an equitable defense are two separate questions, to be addressed on their own terms. See In re Dublin Secs., Inc., 133 F.3d 377, 380 (6th Cir. 1997) (analyzing in pari delicto separately from standing).

That said, we will address both doctrines because, together, they formed the basis of the District Court's judgment. As a threshold requirement, standing demands our initial attention. See Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 471-74 (1982) (discussing the fundamental requirement of standing). Citing Warth v. Seldin , 422 U.S. 490, 501 (1975), for the proposition that standing requires a "distinct and palpable injury," Lafferty argues that the Committee lacks standing because the Debtors have not sustained a "cognizable injury" separate and apart from any injury sustained by investors who had purchased the Debtors' debt securities. As such, Lafferty maintains that the Committee may not bring those claims under the

7

Supreme Court's decision in Caplin v. Marine Midland Grace Trust Co., in which the Court held that a bankruptcy trustee has no standing to assert claims on behalf of an estate's creditors. See 406 U.S. 416, 434 (1972).

Lafferty made the same argument to the District Court, which rejected it on the ground that, at the motion to dismiss stage, the court could not foreclose the existence of a separately cognizable injury to the Debtors distinguishable from the injuries suffered by purchasers of the Debtors' certificates:

> Here, the Committee is suing on behalf of the bankrupt debtor corporations [Walnut and ELCOA] -- not on behalf of the creditors themselves. The injury alleged is that "the debtors were fraudulently induced to register, offer and sell certificates when insolvent and thus without ability to repay their obligations to investors. As a result, the debtors' outstanding debt was continually expanded out of all proportion with their ability to repay, forcing them into bankruptcy." Compl. PP 1, 77.
>
> . . . .
>
> Defendants Cogen [ ] and Lafferty maintain that the alleged Ponzi scheme claims belong exclusively to the creditors, citing Hirsch v. Arthur Anderson & Co., 72 F.3d 1085 (2d Cir. 1995). [However, I believe that, w]hile the most obvious damages were those sustained by the creditors who purchased certificates [and securities], the possibility of a distinct and separate injury to the debtor corporations cannot be eliminated at this stage. See In re Plaza Mortg. and Fin. Corp., 187 B.R. 37, 41 (N.D. Ga. 1995) (denying motion to dismiss trustee's claims against accountants who participated in Ponzi scheme and distinguishing Hirsch where only allegation of injury was "unpaid obligations of the debtor to the creditors").

Official Committee of Unsecured Creditors, No. 99-526, slip. op. at 5, 7 (emphasis added).

We agree with the District Court's evaluation. With the exception of a single federal securities law claim, the

Committee brought only state common law claims on behalf of the Debtors. According to the Amended Complaint, the defendants (including Lafferty), through their alleged fraud and participation in the scheme, injured the Debtors by "wrongfully expand[ing] the [D]ebtors' debt out of all proportion of their ability to repay and ultimately forc[ing] the [D]ebtors to seek bankruptcy protection." In other words, the Committee alleges an injury to the Debtors' corporate property from the fraudulent expansion of corporate debt and prolongation of corporate life. This type of injury has been referred to as "deepening insolvency." See, e.g., ALI–ABA Course of Study, Proximate Cause, Foreseeability, and Deepening Insolvency in Accountants' Liability Litigation, C994 ALI–ABA 201, 203 (1995).

As far as the state law claims are concerned, it is clear that, to the extent Pennsylvania law recognizes a cause of action for the Debtors against Lafferty, the Committee can demonstrate the injury required for standing to sue in federal court. Given Lafferty's arguments, the standing analysis then consists of three inquiries: (1) whether the Committee is merely asserting claims belonging to the creditors, (2) whether "deepening insolvency" is a valid theory giving rise to a cognizable injury under Pennsylvania state law, and (3) whether, as Lafferty contends, the injury is merely illusory.

A. Whether the Committee is merely asserting claims belonging to creditors

Whether a right of action belongs to the debtor or to individual creditors is a question of state law. Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1093 (2d Cir. 1995). In Pennsylvania, as in almost every other state, "a corporation is a distinct and separate entity, irrespective of the persons who own all its stock." Barium Steel Corp. v. Wiley, 108 A.2d 336, 341 (Pa. 1954) (citations omitted); accord In re Erie Drug Co., 204 A.2d 256, 257 (Pa. 1964). From this principle arises a distinction between the property of a corporation and that of others. For example, with respect to shareholders,

> [t]he fact that one person owns all of the stock does not make him and the corporation one and the same

9

person, nor does he thereby become the owner of all the property of the corporation. The shares of stock of a corporation are essentially distinct and different from the corporate property.

Barium Steel, 108 A.2d at 341 (citations omitted); see also Meitner v. State Real Estate Comm'n, 275 A.2d 417, 419 (Pa. Commw. Ct. 1971) (stating that "officers of corporations are not deemed to be the owners of corporate property even to the extent that they are shareholders").

The legal fiction of corporate existence corresponds with the view that an injury to the corporate body is legally distinct from an injury to another person. Thus, it is well established, under Pennsylvania law, that where fraud, mismanagement, or other wrong damages a corporation's assets, a shareholder does not have a direct cause of action. Burdon v. Erskine, 401 A.2d 369, 370-71 (Pa. Super. Ct. 1979) (citation omitted). Rather, it is the corporate body that suffers the primary wrong and, consequently, it is the corporate body that possesses the right to sue. John L. Motley Assoc., Inc. v. Rumbaugh, 104 B.R. 683, 686-87 (E.D. Pa. 1989) (citations omitted) (describing Pennsylvania law). Thus, "an action to redress injuries to the corporation cannot be maintained by an individual shareholder, but must be brought as a derivative action in the name of the corporation." Id. (citations omitted) (describing Pennsylvania law); see also 12 Summary of Pennsylvania Jurisprudence Business Relationships S 7:90 (2d ed. 1993) ("creditors claiming a beneficial interest in the corporation . . . may not[even] maintain a derivative action").

It follows from this discussion that a corporation can suffer an injury unto itself, and any claim it asserts to recover for that injury is independent and separate from the claims of shareholders, creditors, and others. We think it is irrelevant that, in bankruptcy, a successfully prosecuted cause of action leads to an inflow of money to the estate that will immediately flow out again to repay creditors:

The . . . assertion that this action will benefit creditors is not an admission that this action is being brought on their behalf. In a liquidation case, it is

10

> commonplace for a trustee to pursue an action on behalf of the debtor in order to obtain a recovery thereon for the estate. If the trustee is successful in the action, the recovery which he obtains becomes property of the estate and is then distributed pursuant to the scheme established by S 726(a). Simply because the creditors of a[n] estate may be the primary or even the only beneficiaries of such a recovery does not transform the action into a suit by the creditors. Otherwise, whenever a lawsuit constituted property of an estate which has insufficient funds to pay all creditors, the lawsuit would be worthless since under Caplin it could not be pursued by the trustee.

In re: Jack Greenberg, Inc., 240 B.R. 486, 506 (Bankr. E.D. Pa. 1999); accord Scholes v. Lehmann, 56 F.3d 750, 754 (7th Cir. 1995) ("That the return would benefit the limited partners is just to say that anything that helps a corporation helps those who have claims against its assets.").

In the instant case, the Committee sought recovery of damage to the Debtors' property from "deepening insolvency." We see no indication that the Committee is attempting to recover for injuries to the creditors. Cf. Caplin, 406 U.S. at 434 (holding that a trustee may not assert claims on behalf of creditors). Therefore, accepting the allegations as true and drawing all reasonable inferences in favor of the Committee, we conclude that the claims here belong to the Debtors, rather than to the creditors.

B. Whether "deepening insolvency" is a valid theory that gives rise to a cognizable injury under state law

Having established that the Committee brought claims on behalf of the Debtors, rather than the creditors, we must now determine whether the alleged theory of injury-- "deepening insolvency" -- is cognizable under Pennsylvania law. Neither the Pennsylvania Supreme Court nor any intermediate Pennsylvania court has directly addressed this issue. In the absence of an opinion from the state's highest tribunal, we must don the soothsayer's garb and predict how that court would rule if it were presented with the

11

question. See Wiley v. State Farm Fire & Casualty Co., 995 F.2d 457, 459 (3d Cir. 1993). Indeed, because no state or federal courts have interpreted Pennsylvania law on this subject, we will rely predominantly on decisions interpreting the law of other jurisdictions and on the policy underlying Pennsylvania tort law to make this prediction. See Gruber v. Owens-Illinois, Inc., 899 F.2d 1366, 1369-70 (3d Cir. 1990) (noting possible sources of authority for making a prediction).

Drawing guidance from these authorities, we conclude that, if faced with the issue, the Pennsylvania Supreme Court would determine that "deepening insolvency" may give rise to a cognizable injury. First and foremost, the theory is essentially sound. Under federal bankruptcy law, insolvency is a financial condition in which a corporation's debts exceed the fair market value of its assets. 11 U.S.C. S 101(32). Even when a corporation is insolvent, its corporate property may have value. The fraudulent and concealed incurrence of debt can damage that value in several ways. For example, to the extent that bankruptcy is not already a certainty, the incurrence of debt can force an insolvent corporation into bankruptcy, thus inflicting legal and administrative costs on the corporation. See  Richard A. Brealey & Stewart C. Myers, Principles of Corporate Finance 487 (5th ed. 1996) ("[B]y issuing risky debt,[a corporation] give[s] lawyers and the court system a claim on the firm if it defaults."). When brought on by unwieldy debt, bankruptcy also creates operational limitations which hurt a corporation's ability to run its business in a profitable manner. See id. at 488-89. Aside from causing actual bankruptcy, deepening insolvency can undermine a corporation's relationships with its customers, suppliers, and employees. The very threat of bankruptcy, brought about through fraudulent debt, can shake the confidence of parties dealing with the corporation, calling into question its ability to perform, thereby damaging the corporation's assets, the value of which often depends on the performance of other parties. See Michael S. Knoll, Taxing Prometheus: How the Corporate Interest Deduction Discourages Innovation and Risk-Taking, 38 Vill. L. Rev. 1461, 1479-80 (1993). In addition, prolonging an insolvent

12

corporation's life through bad debt may simply cause the dissipation of corporate assets.

These harms can be averted, and the value within an insolvent corporation salvaged, if the corporation is dissolved in a timely manner, rather than kept afloat with spurious debt. As the Seventh Circuit explained in Schacht v. Brown:

> [C]ases [that oppose "deepening insolvency"] rest[ ] upon a seriously flawed assumption, i.e., that the fraudulent prolongation of a corporation's life beyond insolvency is automatically to be considered a benefit to the corporation's interests. This premise collides with common sense, for the corporate body is ineluctably damaged by the deepening of its insolvency, through increased exposure to creditor liability. Indeed, in most cases, it would be crucial that the insolvency of the corporation be disclosed, so that shareholders may exercise their right to dissolve the corporation in order to cut their losses. Thus, acceptance of a rule which would bar a corporation from recovering damages due to the hiding of information concerning its insolvency would create perverse incentives for wrong-doing officers and directors to conceal the true financial condition of the corporation from the corporate body as long as possible.

711 F.2d 1343, 1350 (7th Cir. 1983) (citations omitted) (emphasis added).

Growing acceptance of the deepening insolvency theory confirms its soundness. In recent years, a number of federal courts have held that "deepening insolvency" may give rise to a cognizable injury to corporate debtors. See, e.g., id. (applying Illinois law and holding that, where a debtor corporation was fraudulently continued in business past the point of insolvency, the liquidator had standing to maintain a civil action under racketeering law); Hannover Corp. of America v. Beckner, 211 B.R. 849, 854-55 (M.D. La. 1997) (applying Louisiana law and stating that"a corporation can suffer injury from fraudulently extended life, dissipation of assets, or increased insolvency"); Allard v. Arthur Andersen & Co., 924 F. Supp. 488, 494 (S.D.N.Y.

13

1996) (applying New York law and stating that, as to suit brought by bankruptcy trustee, "[b]ecause courts have permitted recovery under the `deepening insolvency' theory, [defendant] is not entitled to summary judgment as to whatever portion of the claim for relief represents damages flowing from indebtedness to trade creditors"); In re Gouiran Holdings, Inc., 165 B.R. 104, 107 (E.D.N.Y. 1994) (applying New York law, and refusing to dismiss claims brought by a creditors' committee because it was possible that,"under some set of facts two years of negligently prepared financial statements could have been a substantial cause of[the debtor] incurring unmanageable debt and filing for bankruptcy protection"); Feltman v. Prudential Bache Securities, 122 B.R. 466, 473 (S.D. Fla. 1990) (stating that an " `artificial and fraudulently prolonged life . . . and . . . consequent dissipation of assets' constitutes a recognized injury for which a corporation can sue under certain conditions", but concluding that there was no injury on the facts). Some state courts have also recognized the deepening insolvency theory. See, e.g., Herbert H. Post & Co. v. Sidney Bitterman, Inc., 219 A.D. 2d 214 (N.Y. App. Div. 1st Dep't 1996) (applying New York law and allowing a malpractice claim for failing to detect embezzlement that weakened a company, which already was operating at a loss, thereby causing default on loans and forcing liquidation); Corcoran v. Frank B. Hall & Co. , 149 A.D. 2d 165, 175 (N.Y. App. Div. 1st Dep't 1989) (applying New York law and allowing claims for causing a company to"assume additional risks and thereby increase the extent of its exposure to creditors").

Significantly, one of the most venerable principles in Pennsylvania jurisprudence, and in most common law jurisdictions for that matter, is that, where there is an injury, the law provides a remedy. See 37 Pennsylvania Law Encyclopedia, Torts S 4, at 120 (1961) ("For every legal wrong there must be a correlative legal right.") (citation omitted). Thus, an identifiable and compensable injury is essential to the existence of tort liability, Schweitzer v. Consolidated Rail Corp., 758 F.2d 936, 942 (3d Cir. 1985), but once an injury has occurred, "tort law attempts to place the injured party in the same position he occupied before the injury," Hahn v. Atlantic Richfield Co. , 625 F.2d 1095,

14

1104 (3d Cir. 1980) (construing Pennsylvania tort policy). Similarly, where a contractual "breach occurs, contract law seeks to give to the nonbreaching party the benefit of his or her bargain, to put him or her in the position he or she would have been in had there been no breach." 1 Summary of Pennsylvania Jurisprudence Torts S 1.1 (2d ed. 1999). Thus, where "deepening insolvency" causes damage to corporate property, we believe that the Pennsylvania Supreme Court would provide a remedy by recognizing a cause of action for that injury.

Lafferty challenges the strong rationales for recognizing an injury here, citing a few cases that it claims reject "deepening insolvency." In our view, the majority of these cases do not address "deepening insolvency," but rather, simply apply the Supreme Court's holding in Caplin that a bankruptcy trustee has no standing to assert claims on behalf of creditors. See, e.g., Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1093-94 (2d Cir. 1995); E.F. Hutton & Co. v. Hadley, 901 F.2d 979, 986-87 (11th Cir. 1990); Williams v. California 1st Bank, 859 F.2d 664, 666-67 (9th Cir. 1988). These decisions are not relevant to the present case because, as we explained earlier, the Committee is proceeding on behalf of the Debtors, not the creditors. Moreover, to the extent that either the cases cited by Lafferty or other cases suggest that a corporation may never sue to recover damages resulting from the fraudulent prolongation of its life past solvency, we believe, under the same analysis conducted by the Seventh Circuit in Schacht, that Pennsylvania courts would reject them.

We pause here to consider the 19th century case of Patterson v. Franklin, 35 A. 205 (Pa. 1896), an arguably applicable decision of the Pennsylvania Supreme Court. In Patterson, an assignee standing in the shoes of an insolvent corporation brought suit against the incorporators, claiming that they had allegedly made false representations in the statement of incorporation. Id. at 206. Apparently, the false representations had allowed the corporation to contract more debts. Id. On these allegations, the Pennsylvania Supreme Court affirmed the dismissal of the assignee's claims, reasoning that, because the assignee had alleged that the corporation had benefitted from the representations, there was no viable cause of action. Id.

15

In our view, Patterson is not controlling here. The Patterson court never expressly considered the "deepening insolvency" theory, as the opinion does not indicate that the assignee presented any version of that argument to the court. In fact, it seems that the assignee in Patterson had not even alleged an injury to the corporation at all:

> The fraud was perpetrated for its benefit. It was a gainer, not a loser because of it. It was given a considerable credit by the statement to which, as it is alleged, it had no claim whatever.

Id. (emphasis added). Thus, given the allegations in the case, it was perfectly reasonable for the court in Patterson to affirm the dismissal. See also Kinter v. Connolly, 81 A. 905, 905 (Pa. 1911) (rejecting receiver's claim on behalf of the corporation against the directors for fraudulent statements that induced parties to do business with the corporation because "there [was] no averment that any act or omission of those of the defendants who demur caused loss or injury to the [corporation].").

Our reading of Patterson is informed in part by its age. In the hundred-plus years between that decision and the present, the business practices of corporations in the United States have changed quite dramatically. Likewise, society's understanding of corporate theory has grown. See William W. Bratton, Jr., The New Economic Theory of the Firm: Critical Perspectives from History, 41 Stan. L. Rev. 1471, 1482-1501 (1989) (describing the evolution of corporations over the last two centuries); see also Henry Hansmann & Reinier Kraakman, The End of History for Corporate Law, 89 Geo. L.J. 439, 440-49 (2001) (describing the history of models for corporate structure and governance). Therefore, we decline to draw any broad principle from Patterson, a decision which did not directly address "deepening insolvency."

In sum, we believe that the soundness of the theory, its growing acceptance among courts, and the remedial theme in Pennsylvania law would persuade the Pennsylvania Supreme Court to recognize "deepening insolvency" as giving rise to a cognizable injury in the proper circumstances. We now apply this conclusion to the allegations presented in this case.

16

C. Whether, as Lafferty contends, the injury is merely
        illusory

At oral argument, Lafferty observed that, under the Ponzi
scheme alleged in the Committee's Amended Complaint,
any fraudulent debt certificates issued by the Debtors
would have created a capital flow into the Debtors, allowing
them to pay the perpetrators of the fraud, the Shapiros,
who were at the top of the pyramid. Stated in slightly
different terms, we understand Lafferty to be saying that
any injury to the Debtors caused by deepening insolvency
might be considered illusory because that injury passed
directly to the sole shareholders and wrongdoers, the
Shapiro family. See, e.g., Feltman, 122 B.R. at 473-74
(accepting "deepening insolvency" but concluding that,
because a corporation was fictitious, any injury to it was
illusory). As we discussed earlier, so long as the corporate
form is respected, the alleged "deepening insolvency" injury
to the property of the Debtors cannot be regarded as
equivalent to the Shapiro family's shareholder interest. See
Barium Steel, 108 A.2d at 341 (corporate property is
distinct from shareholder property); John L. Motley Assoc.,
104 B.R. at 686-87 (causes of action for damage to
corporate property belong to the corporation). Thus, we
think that Lafferty is essentially asking us to disregard the
corporate existence of Walnut, whose status separates the
Debtors' property, and hence, the alleged injury from the
Shapiro family's shareholder interest.3

As a result, Lafferty's argument implicitly invokes the
"piercing the corporate veil" doctrine, which treats a
corporation and its shareholders as identical for purposes
of suit, thereby imposing personal liability on shareholders.
See Kiehl v. Action Mfg. Co., 535 A.2d 571, 574 (Pa. 1987).
We doubt that the Pennsylvania Supreme Court would
apply any form of the doctrine here. The present issue, after
all, involves the defendant Lafferty invoking the doctrine to
demonstrate the lack of injury to the Debtors, whereas in
the standard scenario the plaintiff invokes the"piercing the
_____

3. The corporate existence of ELCOA is irrelevant to this inquiry because
ELCOA was wholly owned by Walnut. It is Walnut's corporate existence
that provides the legal fiction separating the Debtors from the Shapiros.

17

corporate veil" doctrine to impose liability on shareholders. Even assuming, for argument's sake, that the Pennsylvania Supreme Court would consider the merits of the corporate veil doctrine here, we think that, given the pleadings, the court would not disregard Walnut's corporate form and would not find the alleged injury to the Debtors to be illusory.

In Pennsylvania, "courts will disregard the corporate entity only in limited circumstances when [the form is] used to defeat public convenience, justify wrong, protect fraud or defend crime." Kiehl, 535 A.2d at 574. This is a stringent inquiry. "[C]ourt[s] must start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception. . . . Care should be taken on all occasions to avoid making the entire theory of the corporate entity useless." Wedner v. Unemployment Compensation Bd. of Review, 296 A.2d 792, 795 (Pa. 1972) (quoting Zubik v. Zubik, 384 F.2d 267, 273 (3d Cir. 1967)) (internal quotations omitted).

The narrow circumstances in which Pennsylvania courts will disregard the corporate form are demonstrated by the number of cases, outside traditional attempts to impose liability on shareholders, that reject such arguments. See, e.g., Kiehl, 535 A.2d at 574–75 (refusing to disregard the corporate form between parents and subsidiaries when applying workmen's compensation laws); Wedner , 296 A.2d at 794–96 (reversing the determination of a board of unemployment compensation to ignore the corporate form to deny benefits to an employee shareholder); Shared Communications Servs. of 1800–80 JFK Boulevard, Inc. v. Bell Atlantic Props., Inc., 692 A.2d 570, 573–74 (Pa. Super. Ct. 1997) (refusing, on a common law conspiracy claim, to ignore the legal corporate form between parents and wholly owned subsidiaries).

We conclude, on the allegations presented here, that the circumstances for ignoring Walnut's corporate form do not exist with certainty. Although the Committee alleged in the Amended Complaint that the Shapiro family had made misrepresentations through Walnut, it did not allege that Walnut was a fictional or sham corporation. Cf. Feltman, 122 B.R. at 473–74 (concluding that a deepening insolvency

18

injury was illusory because the debtor corporations were fictitious with no corporate identity separate from their sole shareholder). The Committee merely identified Walnut as an equipment leasing company, with no indication that Walnut's business activities, apart from its debt certificates, were anything but legitimate and real. Moreover, the record does not support a finding that corporate formalities were ignored. Although the Shapiros used Walnut to commit a fraud, the Committee has not alleged that Walnut lacked a corporate identity separate from the Shapiro family.

Thus, accepting all of the Committee's allegations as true and reading them in the light most favorable to the Committee, we cannot state with certainty that Walnut's corporate existence should be disregarded such that any deepening insolvency injury was illusory. See Weston v. Commw. of Pennsylvania, 251 F.3d 420, 425 (3d Cir. 2001) ("We will affirm a dismissal only if it appears certain that a plaintiff will be unable to support his claim."). We therefore agree with the District Court that the possibility of a distinct and separate injury to the Debtors cannot be ruled out at the motion to dismiss stage.

Up until this point in our analysis of standing, we have spoken only in terms of the Committee's state law claims under Pennsylvania law. With regard to the Committee's single federal securities claim, we are confident that the principles we have elucidated are so well accepted that the analysis of that claim is the same. That is, insofar as alleged securities misrepresentations induced the Debtors to incur excessive debt which damaged corporate property, we think that the claim belongs to the Debtors, not to the creditors. Cf. Caplin, 406 U.S. at 434. Furthermore, for the reasons noted earlier, we believe "deepening insolvency" is generally a valid theory for federal law claims. See Schacht, 711 F.2d at 1350.

Thus, because the Committee properly asserts the claims of the Debtors, rather than the creditors, and because we recognize deepening insolvency as a valid theory giving rise to a claim under Pennsylvania law, we hold that the District Court did not err in concluding that the Committee had standing to bring the Debtors' claims against Lafferty.

IV.

Having determined that the Committee has standing to bring the Debtors' claims, we now address Lafferty's assertion of the doctrine of in pari delicto as an affirmative defense against those claims. The doctrine of in pari delicto provides that a plaintiff may not assert a claim against a defendant if the plaintiff bears fault for the claim. See Feld and Sons, Inc. v. Pechner, Dorfman, Wolfee, Rounick and Cabot, 458 A.2d 545, 548-49 (Pa. Super. Ct. 1983); see also American Trade Partners, L.P. v. A-1 International Importing Enterprises, Ltd., 770 F. Supp. 273, 276 (E.D. Pa. 1991) (under the in pari delicto doctrine, "a party is barred from recovering damages if his losses are substantially caused by activities the law forbade him to engage in"). Under Pennsylvania law (as well as federal law), in pari delicto is a doctrine of equity. See Peyton v. Margiotti , 156 A.2d 865, 868 (Pa. 1959); Reynolds v. Boland, 52 A. 19, 21 (Pa. 1902). More generally, the broad idea captured by the doctrine may involve a number of different defenses, depending on whether a contract, tort, or other claim is asserted. We nevertheless can legitimately speak of one doctrine, in pari delicto, across the different claims because the analysis under the various causes of action will typically be the same. Judge Posner made this point in Cenco, Inc. v. Seidman & Seidman:

> The challenged [jury] instructions relate to the question whether Seidman was entitled to use the wrongdoing of Cenco's managers as a defense against the charges of breach of contract, negligence, and fraud [which] when committed by auditors, are a single form of wrongdoing under different names. . . . Because these theories of auditors' misconduct are so alike, the defenses based on misconduct of the audited firm or its employees are also alike, though verbalized differently. A breach of contract is excused if the promisee's hindrance or failure to cooperate prevented the promisor from performing the contract. The corresponding defense in the case of negligence is, of course, contributory negligence. . . . [And, in the fraud context, a] participant in a fraud cannot also be a victim entitled to recover damages, for he cannot have relied on the

20

> truth of the fraudulent representations, and such
> reliance is an essential element in a case of fraud.

686 F.2d 449, 453-54 (7th Cir. 1982) (citation omitted).

Whether the in pari delicto doctrine applies here depends on whether the Shapiro family's conduct can be imputed to the Debtors and hence to the Committee, which, under bankruptcy law, stands in the shoes of the Debtors. Imputation refers to the attribution of one person's wrongdoing to another person. For example, in the present case, the rules of imputation determine whether or not the Debtors will be deemed to have participated in wrongdoing because of the acts of the Debtors' management. If wrongdoing is imputed, then the in pari delicto doctrine comes into play and bars a suit.

In the present case, the District Court imputed the Shapiro family's wrongdoing to the Debtors and held that the Committee, standing in the shoes of the Debtors, was barred from bringing claims under the doctrine of in pari delicto. On appeal, the Committee argues that the District Court erred in discounting the Committee's status as an innocent successor when applying the in pari delicto defense. For support, the Committee relies primarily on In re: Jack Greenberg, Inc., 240 B.R. 486 (Bankr. E.D. Pa. 1999). The crux of its argument is that, under Pennsylvania law, courts may disallow the in pari delicto defense when its invocation would produce an inequitable result. See id. at 504. According to the Committee, the fact of bankruptcy and the resulting removal of the Shapiro family and their co-conspirators from management prevents bad actors from benefitting from a recovery to the Debtors. Because only innocent creditors would now benefit from this suit, the Committee argues that the imputation of the Shapiro family's wrongdoing to the Debtors and the consequent application of the in pari delicto doctrine are unwarranted.

The Committee's argument requires us to resolve two related questions. First, we must decide whether, when evaluating a claim brought by a bankruptcy trustee, a court of law may consider post-petition events that may affect an equitable defense, such as in pari delicto. Second, we must decide whether, in light of our answer to the first question,

21

the Shapiro family's conduct should in fact be imputed to the Debtors such that the doctrine of in pari delicto bars the Committee's claims.

A.

The first question is whether post-petition events may be considered when evaluating a claim in bankruptcy. At the outset, we note that the application of the in pari delicto doctrine is affected by the rules governing bankruptcies. The bankruptcy trustee -- or in this case the Committee -- is the representative of the bankruptcy estate. See 11 U.S.C. S 323(a); In re Mediators, Inc., 105 F.3d 822, 826 (2d Cir. 1997) (suggesting that, when a committee bring claims on behalf of a debtor, it takes on the characteristics of a trustee). Therefore, in this case, the bankruptcy laws authorize the Committee to "commence and prosecute any action or proceeding in behalf of the estate before any tribunal." Fed. R. Bankr. P. 6009; cf. 11 U.S.C. SS 1207, 1306. "Such actions . . . fall into two categories: (1) those brought by the trustee as successor to the debtor's interest included in the estate under Section 541, and (2) those brought under one or more of the trustee's avoiding powers." 3 Collier on Bankruptcy P 323.03[2] (15th rev. ed. 2001). The trustee's "avoiding" powers are not implicated here, as they relate to the trustee's power to resist pre-bankruptcy transfers of property.

Instead, the Committee brings claims against Lafferty as a successor to Walnut and ELCOA's interest. Section 541 covers such claims. Under section 541, the bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement" of bankruptcy. 11 U.S.C. S 541(a) (emphasis added); see also O'Dowd v. Trueger, 233 F.3d 197, 202 (3d Cir. 2000). These legal and equitable interests include causes of action. 3 Collier on Bankruptcy P 323.02[1]; accord O'Dowd, 233 F.3d at 202-03. Given these provisions, we have held that "in actions brought by the trustee as successor to the debtor's interest under section 541, the `trustee stands in the shoes of the debtor and can only assert those causes of action possessed by the debtor. [Conversely,] [t]he trustee is, of course, subject to the same defenses as could have been

22

asserted by the defendant had the action been instituted by the debtor.' " Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 885 F.2d 1149, 1154 (3d Cir. 1989) (quoting Collier on Bankruptcy P 323.02[4]).

As these authorities demonstrate, the explicit language of section 541 directs courts to evaluate defenses as they existed at the commencement of the bankruptcy. This direction is entirely consistent with the legislative history. The Senate Report to the Bankruptcy Reform Act of 1978 made clear that the appropriate frame of reference for section 541 is the state of the debtor as of the commencement of the bankruptcy:

> Though [section 541] will include choses in action and claims by the debtor against others, it is not intended to expand the debtor's rights against others more than they exist at the commencement of the case. For example, if the debtor has a claim that is barred at the time of the commencement of the case by the statute of limitations, then the trustee would not be able to pursue that claim, because he too would be barred. He could take no greater rights than the debtor himself had.

S. Rep. No. 95-989, at 82 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5868 (capitals in the original omitted). The House Report contains identical language. See H.R. Rep. No. 95-595, at 367-68 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6323.

The answer to our first question should now be apparent. The Committee asks us to consider post-petition events, namely, the removal of the Shapiro family and their co-conspirators from the Debtors' management, as well as the Committee's status as an innocent successor, when weighing the equities of the in pari delicto defense. The plain language of section 541, however, prevents courts from taking into account events that occur after the commencement of the bankruptcy case. As a result, we must evaluate the in pari delicto defense without regard to whether the Committee is an innocent successor. See Bank of Marin v. England, 385 U.S. 99, 101 (1966) ("The trustee succeeds only to such rights as the bankrupt possessed;

23

and the trustee is subject to all claims and defenses which might have been asserted against the bankruptcy but for the filing of the petition."); Integrated Solutions, Inc. v. Serv. Support Specialties, Inc., 124 F.3d 487, 495 (3d Cir. 1997) (stating that it is a "fundamental principle that the estate succeeds only to the nature and the rights of the property interest that the debtor possessed pre-petition").

We thus agree with the analysis of the Tenth Circuit in In re: Hedged-Investments Assocs., Inc., 84 F.3d 1281 (10th Cir. 1996), which employed section 541 in applying the in pari delicto doctrine to bar a bankruptcy trustee's suit against a third-party. In Hedged-Investments, an individual ran a Ponzi scheme through a solely owned corporation and three limited partnerships. After the scheme collapsed, the corporation and the partnerships went into bankruptcy. A bankruptcy trustee was appointed over the four entities, and the trustee subsequently brought suit on behalf of the debtors against third-party investors who had profited from the Ponzi scheme. See id. at 1282. The district court applied the in pari delicto defense and dismissed the suit. See id.

The trustee argued before the Tenth Circuit, as the Committee does here, that his status as a bankruptcy trustee prevented the application of the in pari delicto defense. In support, he cited Scholes v. Lehmann , a case in which the Seventh Circuit refused to apply the defense to bar a receiver from bringing fraudulent conveyance actions on behalf of the debtor corporations against third-parties and others who had received funds from the corporations. See 56 F.3d at 754-55. The Scholes court's holding rested on the rationale that the appointment of the innocent receiver had removed the wrongdoer from the scene and changed the equities such that the in pari delicto doctrine "los[t] its sting." Id. (citations omitted).

The Tenth Circuit rejected the trustee's argument and held that the trustee could not bring suit against the third-party investors because "one who has himself participated in a violation of law cannot be permitted to assert . . . any right founded upon . . . the illegal transaction." Hedged-Investments, 84 F.3d at 1284 (internal quotations and citations omitted). It reasoned that, while the Seventh

24

Circuit's reasoning in Scholes might be preferable from a public policy perspective, it did not comport with the plain language of section 541, which explicitly provided that the bankruptcy estate "is comprised of . . . all legal or equitable interests of the debtor in property as of the commencement of the case." Id. at 1285. The court explained the significance of that language:

> We emphasize [that] S 541(a)(1) limits estate property to the debtor's interests "as of the commencement of the case." This phrase places both temporal and qualitative limitations on the reach of the bankruptcy estate. In a temporal sense, it establishes a clear-cut date after which property acquired by the debtor will normally not become property of the bankruptcy estate. In a qualitative sense, the phrase establishes the estate's rights as no stronger than they were when actually held by the debtor. Congress intended the trustee to stand in the shoes of the debtor and "take no greater rights than the debtor himself had." Therefore, to the extent [that the trustee] must rely on 11 U.S.C. S 541 for his standing in this case, he may not use his status as trustee to insulate the partnership from . . . wrongdoing . . .
>
> . . . .
>
> Neither the text of the [Bankruptcy] Code nor its legislative history suggests any exceptions to the principle that the strength of an estate's cause of action is measured by how it stood "as of commencement of the case."

Id. at 1285-86 (citations omitted).

We note that the Tenth Circuit is not alone. Both the Second and Sixth Circuits have also applied the in pari delicto doctrine to bar claims of a bankruptcy trustee, standing in the shoes of a debtor, against third-parties, without regard to the trustee's status as an innocent successor. See Dublin Secs., 133 F.3d at 380 (applying Ohio law); Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1093-94 (2d Cir. 1995) (applying Connecticut law); Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 120 (2d Cir. 1991) (applying New York law); see also The Mediators, 105

25

F.3d at 825–27 (summarizing Hirsch and Wagoner and applying New York law to find that a bankruptcy trustee has no standing to assert claims against third-parties for cooperating in the very misconduct that the debtor had initiated). Our research reveals no courts that hold otherwise in the bankruptcy context.

We certainly acknowledge that, in the receivership context, several courts have declined to apply in pari delicto to bar the receiver from asserting the claims of an insolvent corporation on the ground that application of the doctrine to an innocent successor would be inequitable. These courts have thought it proper to consider events arising after a corporation enters into receivership. See, e.g., FDIC v. O'Melveny & Myers, 61 F.3d 17, 19 (9th Cir. 1995) ("While a party may itself be denied a right or defense on account of its misdeeds, there is little reason to impose the same punishment on . . . [an] innocent entity that steps into the party's shoes pursuant to court order or operation of law."); Scholes, 56 F.3d at 754 (stating that "the defense of in pari delicto loses its sting when the person who is in pari delicto is eliminated"). These cases are easily distinguishable, however; unlike bankruptcy trustees, receivers are not subject to the limits of section 541.

B.

The second question we must answer is whether, viewing the Committee as if it had brought its claims as of the commencement of the bankruptcy, as section 541 commands, the Shapiro family's conduct should, in fact, be imputed to the Debtors such that the doctrine of in pari delicto bars the Committee's claims. While bankruptcy law mandates that the trustee step into the shoes of the debtor when asserting causes of action, state law generally provides the substantive law governing imputation for state law claims. See O'Melveny & Myers v. FDIC, 512 U.S. 79, 84, 85, 87–89 (1994) (holding, in the FDIC receivership context, that, without an "explicit federal statutory provision" or special federal interest, state law"governs the imputation of knowledge to corporate victims of alleged negligence").

26

Under the law of imputation, courts impute the fraud of an officer to a corporation when the officer commits the fraud (1) in the course of his employment, and (2) for the benefit of the corporation. See Waslow v. Grant Thornton (In re Jack Greenberg, Inc.), 212 B.R. 76, 83 (Bankr. E.D. Pa. 1997) (citing Rochez Bros., Inc. v. Rhoades, 527 F.2d 880, 884 (3d Cir. 1975), and deriving a federal rule that is consistent with Pennsylvania law); see also Nat'l Bank of Shamokin v. Waynseboro Knitting Co., 172 A. 131, 134 (Pa. 1934) (describing Pennsylvania agency law).

The allegations in the Amended Complaint leave no doubt that the first part of the imputation test is satisfied -- the fraud allegedly perpetrated by the Shapiro family took place in the course of their employment for the Debtors. As the District Court explained:

> William Shapiro is the sole shareholder of Walnut Associates, Inc, which in turn owns debtor Walnut, which owns debtor ELCOA. William Shapiro is president and a director of the debtors. Kenneth Shapiro is debtors' vice-president and a director. Defendants Walnut Associates, William Shapiro, P.C., Welco, Financial Data, and Kenner Collection Agency, which are owned by William Shapiro, are alleged to have played a role in the fraudulent certificate offerings. The debtor corporations are alleged to have been part of the Shapiro Organization -- i.e. , owned and controlled by the Shapiros.

Official Committee of Unsecured Creditors, No. 99-526, slip. op. at 10 (citations omitted). The Committee's central allegation, that the Shapiros "were able to perpetuate their fraudulent scheme for years through the assistance of several `affiliated' companies, including Walnut[and] ELCOA," demonstrates the relationship described by the District Court.

The second part of the imputation test -- whether fraudulent conduct was perpetrated for the benefit of the debtor corporation -- is often analyzed under the"adverse interest exception." Under this exception, fraudulent conduct will not be imputed if the officer's interests were adverse to the corporation and "not for the benefit of the

27

corporation." See Waslow, 212 B.R. at 84 (citing Resolution Trust Corp. v. Farmer, 865 F. Supp. 1143, 1155-56 (E.D. Pa. 1994)); see also Solomon v. Gibson, 615 A.2d 367 (Pa. Super. Ct. 1992) (same).

The Committee argues that the Shapiro family's fraud was adverse to the interests of the Debtors, and indeed, caused damage to them through "deepening insolvency." Thus, the Committee maintains that the Shapiros did not act for the benefit of the Debtors and their fraudulent conduct cannot be imputed to those corporations. However, even assuming that the Shapiros' interests were adverse to the Debtors' interests, the Committee cannot prevail because the "adverse interest exception" is itself subject to an exception -- the "sole actor" exception. The general principle of the "sole actor" exception provides that, if an agent is the sole representative of a principal, then that agent's fraudulent conduct is imputable to the principal regardless of whether the agent's conduct was adverse to the principal's interests. See Waslow, 212 B.R. at 86. The rationale for this rule is that the sole agent has no one to whom he can impart his knowledge, or from whom he can conceal it, and that the corporation must bear the responsibility for allowing an agent to act without accountability. See id. (citing First National Bank of Cicero v. Lewco Secs. Corp., 860 F.2d 1407, 1417-18 (7th Cir. 1988) and William M. Fletcher et al., Fletcher Cyclopedia of the Law of Private Corporations S 827.10, at 160 (perm. ed. rev. vol. 1994)). Pennsylvania has recognized the"sole actor" exception. See Gordon v. Continental Cas. Co., 181 A. 574, 577 (Pa. 1935).

The "sole actor" exception has been applied to cases in which the agent who committed the fraud was also the sole shareholder of the corporation. See, e.g., In re Mediators, 105 F.3d at 827. Courts have additionally applied the exception to cases in which the agent "dominated" the corporation. See, e.g., PNC Bank v. Hous. Mortgage Corp., 899 F. Supp. 1399, 1405-06 (W.D. Pa. 1994) (dismissing corporation's claims against accountants because sole shareholders and officers of corporation participated in alleged fraud).

28

In the present case, the Shapiros clearly dominated Walnut and ELCOA. They were the sole representatives in the alleged fraud with Lafferty. Additionally, William Shapiro was the sole shareholder. And, according to the Amended Complaint, the Shapiros dominated the ownership and control of Walnut and ELCOA. Thus, the "sole actor" exception applies. Further, we reject the Committee's argument that the exception should not apply because several of the Debtors' directors merely acted negligently and did not perpetrate the fraud. The possible existence of any innocent independent directors does not alter the fact that the Shapiros controlled and dominated the Debtors. See Vail Nat'l Bank v. Finkelman , 800 P.2d 1342, 1345 (Colo. Ct. App. 1990) (acknowledging that domination justifies invocation of the "sole actor" exception); FDIC v. Nat'l Surety Corp., 281 N.W.2d 816, 821 (Iowa 1979) (doctrine applies to board of directors or corporation subject to agent's control).

In sum, we will impute the fraudulent conduct of the Shapiros to the Debtors because the Shapiros perpetrated the alleged fraud in the course of their employment, and because, although the Shapiros may have acted adversely to the interests of the Debtors, they were the sole actors engaged in the alleged fraudulent conduct. Viewing the claim as of the commencement of bankruptcy, we find that the in pari delicto doctrine bars the Committee, standing in the shoes of the Debtors, from bringing its claims against Lafferty.

V.

For the reasons stated, we will affirm the judgment of the District Court.

COWEN, Circuit Judge, dissenting:

In this case we confront a regrettably common scenario. Using a type of Ponzi scheme, William and Kenneth Shapiro along with others fraudulently induced the appellant to invest in the Shapiros' companies long past the point where those companies could repay the funds. In the ensuing bankruptcy, the appellant formed a creditors' committee and, acting as the equivalent of a bankruptcy trustee, sought to recover some of its losses by pursuing claims that the debtor corporations have against various professionals, such as accountants and underwriters, who allegedly facilitated the Shapiros' fraud. The majority holds that these creditors -- and indeed any creditors in a case like this -- are barred from obtaining relief in bankruptcy from the professionals. I believe the majority's reasoning rests on a mistaken interpretation of the bankruptcy code, needlessly thwarts recovery for innocent creditors, and insulates from civil liability those who help perpetrate fraud. Under the majority's reasoning, no matter how egregious the conduct is of a professional who facilitated a fraudulent sale of securities, creditors cannot recover from that professional in the likely event that the corporation winds up in bankruptcy.

Despite my disagreement with the outcome reached by the majority, I agree with much of the majority's reasoning. In particular, I agree with the majority that the creditors' committee has standing to sue. The creditors' committee received an assignment of the debtor corporations' claims, and it is well settled that an "assignee of a claim has standing to assert the injury in fact suffered by the assignor." Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765, 774, 120 S.Ct. 1858, 1863 (2000). The question then reverts to whether the debtor corporations have standing. As the majority points out, a corporation has a distinct legal existence from its officers and owners, and economic losses wrongfully suffered by a corporation are sufficient injuries to confer standing. See, e.g., Barlow v. Collins , 397 U.S. 159, 90 S.Ct. 832 (1970); Hardin v. Kentucky Utils. Co. , 390 U.S. 1, 88 S.Ct. 651 (1968); FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 60 S.Ct. 693 (1940). The only reason to

30

suppose that a corporation lacks standing in a case like this one is that there is an allegedly valid affirmative defense available against the corporation's claims. But as a general matter, the ultimate merits of an affirmative defense do not raise questions about a plaintiff 's standing, or else the moment the court was poised to rule in favor of the defendant on the affirmative defense, the court would lose jurisdiction and there would be no binding judgment. Moreover, as I explain below, I think the defense fails in this case.

Like the majority, I agree that in evaluating the affirmative defense at issue here -- the in pari delicto doctrine -- we apply state law for the plaintiffs' state causes of action, see O'Melveny & Meyers v. FDIC, 512 U.S. 79, 83-85, 114 S.Ct. 2048, 2052-53 (1994), and federal law for federal causes of action. Id. (citing Schact v. Brown, 711 F.2d 1343, 1347 (7th Cir. 1983)). And I also agree with the majority that, regardless of whether federal or state (in this case Pennsylvania) law is applied, the in pari delicto doctrine is best understood as a broad equitable principle that encompasses a variety of different, more specific legal rules and defenses drawn from torts, contracts, or other areas of law depending on the underlying cause of action at issue. See Cenco Inc. v. Seidman & Seidman, 686 F.2d 449, 453-54 (7th Cir. 1982). Broadly, the idea behind in pari delicto is that "a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing." Black's Law Dictionary 794 (7th ed. 1999).

Because the wrongdoers here were officers of the debtor corporations, a special case of the in pari delicto doctrine comes into play -- the standards covering when to impute the acts of a corporation's officers to the corporation itself. If those officers remain in control of the corporation or stand to benefit from any recovery, then the officers' conduct plainly would be imputed to the corporation. See, e.g., Cenco, 686 F.2d at 455-56; Rochez Bros., Inc. v. Rhoades, 527 F.2d 880, 884 (3d Cir. 1975).

But, as Judge Posner has explained, the equitable principles underlying the doctrines of imputing misconduct and in pari delicto lead to a different result when the miscreant officers are removed and no wrongdoer will

31

receive the benefit of recovery. See Scholes v. Lehman, 56 F.3d 750, 753-55 (7th Cir. 1995) (citing McCandless v. Furland, 296 U.S. 140, 160, 56 S.Ct. 41, 47 (1935) (Cardozo, J.)). No longer will it be true that, as Black's definition puts it, one "who has participated in wrongdoing [will] . . . recover damages resulting from the wrongdoing." Instead, allowing the corporation to impose liability on professionals who wrongfully facilitated the fraud will both help deter that professional misconduct and help compensate victims who may otherwise go away empty-handed. The Ninth Circuit has recognized this point as well and refused to apply in pari delicto when the recovery would not benefit the wrongdoers. FDIC v. O'Melveny & Myers, 61 F.3d 17, 18, (9th Cir. 1995). Nothing suggests that Pennsylvania would interpret in pari delicto and the rules of imputation differently than the Seventh and Ninth Circuits have.

As I understand the majority, they accept that if the wrongdoers within a corporation are removed and the benefit of the recovery will ultimately help victims of the fraud, then the corporation can proceed with its claims. The reason the majority concludes nevertheless that the creditors' committee is barred from recovery is that at the moment the bankruptcy petition was filed, the majority maintains that the wrongdoers had not actually been removed yet. The majority's argument tracks a Tenth Circuit decision, In re Hedge-Investments Assoc., Inc., 84 F.3d 1281 (10th Cir. 196). That case refused to follow Scholes and the Ninth Circuit's decision in O'Melveny, which both involved receiverships, because the Tenth Circuit thought that a contrary result was compelled by a provision in the bankruptcy code, 11 U.S.C. S 541(a). The court explained that under S 541(a) the debtor's estate is formed at the time the bankruptcy petition is filed. Since the bad corporate officers were only removed post-petition, the court reasoned that S 541(a) dictates that the removal cannot be considered. That is, because the officers were still in control at the moment the petition was filed, in pari delicto still erected a bar at that moment. 84 F.3d at 1285.

There are a number of problems with this reasoning. The first and most obvious is that, whatever the inflexibility is

32

of the bankruptcy code, an equitable doctrine like in pari delicto is highly sensitive to the facts and readily adapted to achieve equitable results. What is sufficient to satisfy the doctrine, in other words, need not be parsed like a statute. Even if we assume that we can look no further than the filing of the bankruptcy petition, it can scarcely be denied that as soon as the Shapiros' companies were placed in bankruptcy, the Shapiros lost any ability to benefit further from their Ponzi scheme. The bankruptcy court would not have allowed itself to become an instrument of their fraud. Some time, of course, would elapse before the full process of bankruptcy proceedings took their course, but there is nothing in the equitable doctrine of in pari delicto that insists those formalities must be completed before the doctrine is triggered.

The point of equitable doctrines is to avoid injustice caused by overly inflexible rules: equity is "[t]he recourse to principles of justice to correct or supplement the law as applied to particular circumstances." Black's Law Dictionary 560 (7th ed. 1999). Here the majority injects a pointless technicality into an equitable doctrine. For example, one court has distinguished the Tenth Circuit's decision that the majority follows by noting that if the debtor corporation is placed in receivership prior to the filing of the bankruptcy petition, there is no in pari delicto bar on an action by the corporation. See, e.g. , Hanover Corp. of America v. Beckner, 221 B.R. 849, 859 (M.D. La. 1997). It is difficult to understand what is accomplished by forcing future plaintiffs to take that extra step or denying these plaintiffs relief because they failed to take it. Equity does not turn on that kind of empty technicality.

A second problem with the majority's reasoning is that, while it is certainly true that a trustee (or a creditor's committee acting as trustee) assumes the same causes of action and is subject to the same defenses as the debtor, see Bank of Marin v. England, 385 U.S. 99, 101, 87 S.Ct. 274, 276 (1966); Integrated Solutions, Inc. v. Serv. Support Specialties, Inc., 124 F.3d 487, 495 (3d Cir. 1997), that rule does not mandate that in evaluating a trustee's claims on behalf of an estate, post-petition events can never be considered. Segal v. Rochell, 382 U.S. 375, 86 S.Ct. 511

33

(1966). The rule that the trustee must be restricted to the debtor's causes of action and is subject to the same defenses as the debtor does not mandate that post-petition events are never considered in evaluating those causes of action and defenses inherited by the trustee.

In Segal, the question before the Court was whether a trustee could claim as property of the estate a tax loss-carryback refund for a taxable year that ended post-petition. Significantly, even though under the Internal Revenue Code the refund could not be claimed until the end of the taxable year, which occurred after the petition date, the Supreme Court agreed with the trustee that the refund was property of the estate. The refund was "sufficiently rooted in the pre-bankruptcy past and so little entangled with the bankrupt's ability to make an unencumbered fresh start that it should be regarded as "property." 382 U.S. at 380, 86 S.Ct. at 514.

So too in this case the losses suffered by the debtor corporation all took place before the bankruptcy and the only obstacle to the corporations' recovery is the removal of the Shapiros, an event as inevitable as that completion of the taxable year in Segal. More important, since our case involves corporations, there is no concern about the competing fresh-start policy for individuals that the Supreme Court had to weigh in Segal. Corporations do not get fresh starts.

One last point is worth noting parenthetically. Under the majority's logic, the claims brought by the creditors' committee against the Shapiros themselves and other corporate insiders should be barred as well as the claims against the outside professionals. After all, the corporations and the insiders were as much in pari delicto as the corporation and the outside professionals. The District Court did not dismiss the claims against the insiders, but inexplicably failed to explain why those creditors' claims, which apparently were also on behalf of the corporation, were not subject to the same reasoning that the court applied in dismissing the claims against Lafferty. Although the claims against the insiders are not properly before us, having been severed below to create a final judgment, it is

34

especially disturbing that the majority's reasoning applies with equal force to them.

In short, the majority's position retards the normal goals of tort law, misinterprets equitable doctrine, and reads the bankruptcy code too narrowly. I dissent.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

35